# EXHIBIT 1

## Case Information

### SMITH VS TRUIST BANK

24-C-08556-S5

Location
Gwinnett - State Court

Case Category
Civil

Case Type
Tort - General*

Case Filed Date
9/16/2024

Judge
Dove, Erica K.

Case Status
Open (Pending)

### Parties 2

| Type | Name | Nickname/Alias | Attorneys |
|------|------|----------------|-----------|
| Plaintiff | TRENTON LANE SMITH | | OTO U EKPO, RICHARD W HENDRIX, ROBERT G BALLARD |
| Defendant | TRUIST BANK | | Pro Se |

### Events 5

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 9/16/2024 | Filing | Summons | | Summons (Truist Bank).pdf |
| 9/16/2024 | Filing | General Civil/Domestic Relations Case Filing Info | | Civil Cover sheet - Truist Bank.pdf |
| 9/16/2024 | Filing | Complaint with Jury Demand | | 2024-9-13 Final Complaint Truist.pdf |
| 9/20/2024 | Service | Summons | - | - |
| 9/23/2024 | Filing | Sheriffs Entry of Service | TRUIST BANK | Sheriffs Entry of Service.pdf |

© 2024 Tyler Technologies, Inc. | All Rights Reserved

Version: 2024.6.0.471


EMPOWERED BY
TYLER TECHNOLOGIES

E-FILED IN OFFICE - GM
CLERK OF STATE COURT
GWINNETT COUNTY, GEORGIA

**24-C-08556-S5**
**9/16/2024 9:31 AM**
TIANA P. GARNER, CLERK

## IN THE STATE COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

**TRENTON LANE SMITH,**

    **PLAINTIFF.**

  **v.**

**TRUIST BANK,**

    **DEFENDANT.**

**CIVIL ACTION FILE**

**NUMBER:**   24-C-08556-S5

## COMPLAINT FOR DAMAGES

COMES NOW, TRENTON LANE SMITH, Plaintiff in the above-styled action, and respectfully files his Complaint for Damages against TRUIST BANK, and shows the Court as follows:

1.

Plaintiff is the son of Ms. Denise Diane Smith ("Mother") and he is the sole heir at law and beneficiary designated in a Last Will and Testament ("Will"), Life Insurance Policy ("Policy") and Trust Agreement each of which are defined and described in more detail below.

2.

Defendant Truist Bank ("Truist") is a national bank that was formed in 2019 as the result of a merger between BB&T Bank and Sun Trust Bank, national banks. It is the ninth largest bank in the United States.[1]  Truist is the successor by operation of law to the liabilities and obligations of SunTrust Bank. Truist has appointed as its registered agent Corporation Service Company located at 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia, 30092. When

duly served with Summons and Complaint, said defendant will be subject to the jurisdiction of this court.

## **BACKGROUND**

3.

C. David Joyner ("Attorney Joyner") is now deceased and died on January 17, 2023. (Exhibit M) During his life, Attorney Joyner was a resident of Gwinnett County, Georgia.   At the time of his passing, Attorney Joyner resided at 2815 Drayton Hall Drive, Buford, Gwinnett County, Georgia 30519-5807.  Attorney Joyner was the sole owner and controlling shareholder and officer of the Law Firm.  Attorney Joyner's intestate estate (the "Joyner Estate") has been and is currently being probated in Gwinnett County Probate Court, Estate No. 23-E-001345, and Hillary B. Cranford, as County Administrator of Gwinnett County, Georgia, has been appointed Administrator of the Estate, receiving her Letters of Administration on or about October 5, 2023.

4.

Attorney Joyner, his Estate, and his Law Firm are named as defendants in Gwinnett County State Court, Civil Action No. 23-A-00729-6 a lawsuit initiated by Plaintiff. (Exhibit N)  Attorney Joyner, his Estate, and others are named as defendants in Gwinnett County State Court, Civil Action No. 23-A-5262-9, a lawsuit initiated by additional victims (other than Plaintiff) concerning similar tortious acts of Attorney Joyner and his Law Firm. (Exhibit N)

5.

Attorney Joyner was a civil and family law attorney practicing in Gwinnett County. At the time of his passing and at all other times pertinent hereto, he worked as a sole practitioner through the Law Firm.

6.

While alive, Plaintiff's Mother was a successful businesswoman. She owned several trailer trucks, a McDonald's franchise, real estate and other assets.

7.

The Last Will and Testament ("Will") was created on May 13, 1998, and filed in the probate court on August 15, 2017. It named Ruby Smith, Plaintiff's grandmother, as Executor. (Exhibit C)

8.

Plaintiff's Mother purchased a one million dollars ($1,000,000.00) Life Insurance Policy on January 27, 2004, from The State Life Insurance Company ("State Life Insurance"). The Policy named Plaintiff as the sole beneficiary of his Mother's Life Insurance Policy. (Exhibit D)

9.

Following the purchase of the Life Insurance Policy, Mother subsequently executed an Irrevocable Trust Agreement, ("Trust Agreement"), a true and accurate copy of which attached to this Complaint as Exhibit E. The Trust named Plaintiff's Attorney Joyner as Trustee of the Trust, and Plaintiff was named as the sole beneficiary of his Mother's Estate. The Trust was created on dated June 5, 2004.

10.

The Will, Life Insurance Policy, and Trust Agreement all named Plaintiff as the sole beneficiary of all of Plaintiff's assets, money, and Life Insurance Policy proceeds according to the terms of those documents.

11.

The Trust Agreement provided that Plaintiff was entitled to receive the Life Insurance benefits when Plaintiff either "attains the age of twenty-five (25) <u>or graduates from an accredited college, whichever first occurs</u>."  (Exhibit E)

12.

Plaintiff's Mother passed away on July 9, 2017. (Exhibit L) Plaintiff graduated from University of Georgia, an accredited college, with a degree in Management Information Systems on May 5, 2017. (Exhibit F) Plaintiff's graduation occurred two months prior to his mother's death. Therefore, according to the Trust Agreement, Plaintiff was entitled to receive all of his mother's assets and money shortly after his mother's death on July 9, 2017.  (Exhibit E)

13.

After the death of Plaintiff's Mother, Attorney Joyner began gathering all assets on behalf of the Estate and Trust. Attorney Joyner was involved in and controlled all aspects of the administration of Plaintiff's Mother's Estate and Trust, including the sale of Plaintiff's Mother's tractor-trailers, and other assets from her trucking company, her real estate, and all her other assets.

14.

In gathering assets after Mother's death, Attorney Joyner was "acting in his fiduciary capacity as" to both the Estate and Trust on behalf of Plaintiff who was the sole beneficiary of both the Will and Trust Agreement.

15.

The authority given to Attorney Joyner by and through the Trust Agreement gave him discretionary powers to gather assets on behalf of the Trust for the benefit of the Plaintiff. (Exhibit E)

16.

With his authority as Trustee, Attorney Joyner requested that State Life send to him the insurance benefits purchased by Plaintiff's Mother for Plaintiff. In response to Attorney Joyner's request, State Life sent the life insurance proceeds check in the amount of $905,797.31 payable to TRENTON LANE SMITH (Exhibit A) and mailed the check to Attorney Joyner's business address. In addition, the check was accompanied by a letter addressed with Plaintiff name and Attorney Joyner's law firm address explaining the details of the life insurance proceeds. (Exhibit B)

17.

Attorney Joyner was acting in his capacity as a Trustee and on behalf of the Estate in gathering assets and making the request of State Life. However, upon receiving the check from State Life, Attorney Joyner failed to inform Plaintiff that he was in receipt of the check. Plaintiff was unaware how State Life issued the policy proceeds. Nor was Plaintiff aware that any such check was issued or that it was made payable to him until late May of 2024, after Attorney Joyner died and Defendant Hillary Cranford was appointed as County Administrator for the Estate of C. David Joyner.

18.

The life insurance check in the amount of $905,797.31, belonging to Plaintiff, clearly stated Trenton Lane Smith (Plaintiff) was the sole payee on the check; Plaintiff did not sign the check; he did not authorize Attorney Joyner or anyone else to sign the check; and he did not request or authorize Truist bank to accept, negotiate, or deposit the check on his behalf.  Nevertheless, sometime in late 2017, the exact date being unknown, Attorney Joyner presented Truist Bank with the check made payable to Plaintiff, endorsed his own name, C. David Joyner, on the back of the check, and presented the check to Truist Bank. (Exhibit A)

19.

Truist Bank honored the check, with the unauthorized signature, even though the check was made payable only to Plaintiff and endorsed only by Attorney Joyner, and without any notation or verification on the check indicating Attorney Joyner had permission or Power of Attorney to negotiate or deposit the check into his and his Law Firm IOLTA bank account. At no time did Attorney Joyner disclose to Plaintiff his deposit of Plaintiff's check into Joyner's IOLTA account. (Exhibit F).

20.

At no time did Truist Bank notify Plaintiff for any reason, including to notify Plaintiff that the check was being presented for negotiation and deposit by someone other than Plaintiff.

21.

Plaintiff was unaware at the time of his Mother's passing that she had secured any life insurance policy naming him as sole beneficiary and was not informed of its existence by Attorney

Joyner, Truist Bank, or anyone else. Nor did Attorney Joyner disclose to Plaintiff of his request to have State Life send the Policy's proceeds to Joyner's business address. Plaintiff had no knowledge of the existence of the State Life check payable solely to him until around the end of May 2024. (Exhibit F)

22.

After the fact, Attorney Joyner represented to Plaintiff and others that he had set up a Trust Bank Account to hold the assets, money, and life insurance proceeds all of which belonged to Plaintiff. He further claimed that Plaintiff was ineligible to receive any payouts from the Trust account until he reached the age of 25 years. Plaintiff was 22 years old at that time of his mother's death.

23.

Attorney Joyner further represented to Plaintiff that the requirements set forth in the Trust Agreement required Plaintiff to wait until the age of twenty-five (25) before Attorney Joyner could pay out fifty percent (50%) from the Trust Bank Account balance to Plaintiff. The remaining fifty percent (50%) Attorney Joyner explained, he could pay out once Plaintiff reached the age of thirty-five (35). Plaintiff reasonably relied on Attorney Joyner's perceived expertise, understanding, and representations concerning the terms the Trust Agreement and the actions he would take, and did not question Joyner further regarding the details. (Exhibit F)

24.

Plaintiff turned 25 years of age on December 13, 2019. Based on Plaintiff's reliance on Attorney Joyner's prior numerous representations that Plaintiff could not receive a portion of his trust money until he turned 25 years old, Plaintiff only began asking Attorney Joyner about when

he would receive his trust money subsequent to his 25th birthday. (Exhibit G)  In response, Attorney Joyner told Plaintiff that the Trust he set up for Plaintiff was not a normal type of Trust, and therefore that there were several steps Attorney Joyner would first need to take, including steps to make sure Plaintiff wasn't taxed too much on his Trust money. (Exhibit G) Attorney Joyner told Plaintiff these steps would take some time.  However, Attorney Joyner told Plaintiff that he could honor requests for partial withdrawals if Plaintiff had specific needs. (Exhibit H)

25.

At some point in late 2019, Attorney Joyner assisted Plaintiff by reviewing house purchase and mortgage documents related to a house that Plaintiff wanted to purchase, and he also agreed to provide Plaintiff with a "Trust fund advance" for Plaintiff to use as the down payment on his house purchase. (Exhibit H)

26.

As part of the mortgage process, Plaintiff notified Attorney Joyner by email on February 5, 2020, that Plaintiff needed to provide the mortgage company with a copy of Plaintiff's Trust and the most recent 60 day or quarterly statements from the Trust Bank Account. (Exhibit G) In his email response on the same day, Attorney Joyner assured Plaintiff that he would provide the requested documentation.  (Exhibit G)

27.

On February 7, 2020, Attorney Joyner wired to Plaintiff's personal checking account a "Trust advance" in the amount of $80,000 for Plaintiff to use to pay the down payment on Plaintiff's house purchase. (Exhibit I) The source of these funds is currently unknown. The mortgage was approved, and Plaintiff purchased the house, so Plaintiff assumed and believed that

Attorney Joyner provided the mortgage company with the requested Trust Bank Account documentation and was acting consistent with his fiduciary obligations as Trustee.

28.

Due to the COVID pandemic and Attorney Joyner's claims to be constantly busy in court, Plaintiff was unable to reach Attorney Joyner for most of the remainder of 2020 and 2021. When he did speak with Attorney Joyner, Plaintiff was told that unless it was an emergency, it would not be long before the "wind up" process was completed. During that time, Plaintiff was in no urgent need of money and believed his money was safe and gaining interest inside the Trust Bank Account being managed by Attorney Joyner. (Exhibit F)

29.

In late May of 2022, Plaintiff notified Attorney Joyner that Plaintiff needed to purchase a replacement vehicle because his vehicle was not operating well. In response, Attorney Joyner provided Plaintiff a check in the amount of $50,000, as a second advance payment from what Plaintiff believed was from the Trust Bank Account that Attorney Joyner represented he had set up and funded for Plaintiff. (Exhibit I) The source of these funds is currently unknown.

30.

Attorney Joyner represented to Plaintiff on February 5, 2020, that after he negotiated with and paid creditors, lienholders, etc., there were no proceeds from his sale of Plaintiff's Mother's businesses, real estate, etc. to place into the Trust Bank Account at the bank that Attorney Joyner said that he had set up for Plaintiff. (Exhibit H)

31.

Attorney Joyner also represented to Plaintiff on February 5, 2020, that after paying creditors, lienholders, etc., the only funds left for Plaintiff in the Trust Bank Account that Attorney Joyner said he had set up for Plaintiff, were the proceeds from a life insurance policy his Mother had provided for him in the amount of $905,797.31, plus interest, which, at the time of this representation, Attorney Joyner said had increased the balance of Plaintiff's Trust Bank Account to approximately $ 1.1 Million. (Exhibit H)

32.

Following Attorney Joyner' death on January 17th, 2023, Hillary Cranford was appointed as Administrator over Attorney Joyne's Estate on October 5, 2023. In late December of 2023, Plaintiff reached out to Ms. Cranford seeking her help to locate his Trust Bank Account. It was not until late May of 2024 when Plaintiff discovered and confirmed the existence of the State Life check and that he was the named payee. Prior to May of 2024, Plaintiff had no knowledge of the check's existence. (Exhibit F)

33.

At the end of May 2024, and after the appointment of Hilary Cranford as County Administrator for the Estate of Attorney Joyner, it was then discovered by the Plaintiff for the first time that:

        a) the life insurance proceeds check was made payable only to Plaintiff, but was endorsed by Attorney Joyner, and accepted and processed by Sun Trust bank (now "Truist Bank");

b) Truist Bank allowed and facilitated Mr. Joyner's deposit of Plaintiff's life insurance proceeds check, made payable only to Plaintiff, into Attorney Joyner's Law Firm IOLTA bank account number ***0085 at Truist Bank; and,

c) after Truist Bank executed the placement of Plaintiff's life insurance check proceeds into Attorney Joyner's Law Firm IOLTA bank account, and at a time presently unknown, Truist Bank further participated in and facilitated Attorney Joyner's conversion of Plaintiff's money by processing Attorney Joyner's requests to withdraw those funds from his Law Firm IOLTA bank account. By so doing, Truist Bank participated in Attorney Joyner's conversion and unlawful distribution of those funds to Attorney Joyner, to his personal bank and financial accounts, Attorney Joyner's family members and their bank accounts, Attorney Joyner's Law Firm operating accounts, including bank accounts belonging to C. David Joyner, P.C.

34.

Upon information and belief and exact times presently unknown, Attorney Joyner took money that was required to be placed in a Trust Bank Account for Plaintiff, including the proceeds from Plaintiff's Mother's life insurance, and spent such money on personal property and real estate for himself and/or his wife and family and/or to pay business expenses of C. David Joyner, P.C.

35.

Upon information and belief and exact times presently unknown, Attorney Joyner took money that he was required to be placed in a Trust account for Plaintiff, including the proceeds

from Plaintiff's Mother's life insurance policy, and diverted that money to various people other than Plaintiff, including Attorney Joyner's now widow, Cassandra Joyner.

36.

In early 2024, Plaintiff secured a copy of the Trust Agreement. (Exhibit E ) Pursuant to its terms, and contrary to what Attorney Joyner had represented to Plaintiff, Plaintiff was entitled to receive the proceeds from the life insurance check and other funds when Plaintiff attained twenty-five (25) years of age OR when Plaintiff graduated from an accredited college, whichever occurred first. (Exhibit E). Plaintiff was graduated from the University of Georgia, an accredited college, with a degree in Management Information Systems on May 5, 2017. (Exhibit F)  Accordingly, upon receipt of the life insurance proceeds check dated November 3, 2017, at least six months after Plaintiff graduated from UGA, Attorney Joyner was required to have provided direct and full control of the life insurance check and proceeds to Plaintiff.  Truist Bank's acts and omissions set forth herein deprived Plaintiff of his life insurance proceeds and caused other significant losses and damages to Plaintiff.

## COUNT 1
## CONVERSION OF AN INSTRUMENT

37.

Plaintiff hereby realleges all matters set forth in Paragraphs 1 through 36 of this Complaint and incorporate same as if stated verbatim herein.

38.

State Life Insurance Company mailed a check payable to Plaintiff to his business address of Attorney Joyner and he was acting as Plaintiff's agent when he received the life insurance proceeds check from State Life Insurance Company pursuant to O.C.G.A. 11-3-420(a).  However,

Attorney Joyner's authority as Trustee did not extend beyond receiving and holding of the check for Plaintiff.  Attorney Joyner was not authorized by Plaintiff to endorse, deposit, or receive payment from the check.

39.

Upon information and belief Attorney Joyner presented to Truist Bank sometime after November 2017, the exact date being unknown, with the life insurance proceeds check clearly made payable to Plaintiff only.  The check had Plaintiff's name clearly typed in as the only payee on the check, and Attorney Joyner's unauthorized signature, not Plaintiff's, was clearly written on the back of the check. Truist Bank honored and processed both the deposit and the subsequent withdraw of the check proceeds by Attorney Joyner in bad faith, and at no time before or after the check was presented by Attorney Joyner without Plaintiff's endorsement or permission, deposited into Attorney Joyner's account and then withdrawn from that account, did Truist Bank make any contact with Plaintiff to provide notice, question, or inquire about the check, or for any other reason.

40.

Truist Bank negligently and wrongfully honored the life insurance proceeds check (Exhibit A) in violation of O.C.G.A. 11-3-420(a), and sound banking practices. The check was payable only to Plaintiff.  (Exhibit A) Truist Bank failed to exercise ordinary care in honoring the check representing the Plaintiff's life insurance proceeds and thereafter by allowing and facilitating Attorney Joyner's withdraw of those funds belonging to Plaintiff.

## COUNT II

## NEGLIGENCE

41.

Plaintiff hereby realleges all matters set forth in Paragraphs 1 through 40 of this Complaint and incorporate same as if stated verbatim herein.

42.

Attorney Joyner in his capacity as Trustee was acting as an agent when he requested that State Life pay out Life Insurance benefits in accordance with the Trust Agreement. He had the authority to then receive the life insurance proceeds check and hold the check for the Plaintiff. Attorney Joyner was acting as an agent when the check was delivered to his business address pursuant to O.C.G.A. 11-3-420(a).

43.

Attorney Joyner's authority did not extend beyond receipt of the life insurance proceeds check as it was written and made payable. (Exhibit A) Attorney Joyner never disclosed to the Plaintiff, the sole beneficiary of the life insurance policy and the sole payee on the life insurance proceeds check, that he had received the check and Attorney Joyner had no authority to negotiate the check on the Plaintiff's behalf.

44.

Attorney Joyner presented to Truist Bank the check representing the Plaintiff's life insurance proceeds for negotiation as a deposit into the Law Firm IOLTA bank account. The check was endorsed only by Attorney Joyner.  Truist Bank knew that the negotiable instrument was payable only to Plaintiff, as the Plaintiff was clearly the only payee documented on the check, and

Truist Bank had no good faith basis for believing that it had been made payable either to the Law Firm or Attorney Joyner.

45.

   Truist Bank never contacted Plaintiff to inquire notify Plaintiff for any reason, including to inquire, investigate, or question the fact that Attorney Joyner endorsed and presented to Truist for deposit into Attorney Joyner's check the check that was clearly made payable only to Plaintiff.

46.

Truist Bank never received any endorsement on the check or authority by Plaintiff that would allow anyone other than Plaintiff to legally endorse, negotiate, deposit, or receive funds from the check.

47.

Truist Bank negligently and wrongfully honored and converted the check in violation of O.C.G.A. 51-1-2. The check was clearly and unambiguously payable solely to Plaintiff but endorsed only by Attorney Joyner. (Exhibit A) Truist did not exercise ordinary care in honoring the check with an unauthorized signature.

48.

Truist Bank's negligent and wrongful actions caused Plaintiff to be deprived of the life insurance check proceeds, and those proceeds to be directed to people and/or entities other than the payee of a negotiable instrument and it is responsible for the losses to Plaintiff occasioned by its negligent and wrongful actions.

49.

Truist Bank negligently and wrongfully honored and processed Plaintiff's life insurance proceeds check in violation of O.C.G.A. 11-3-420(b) and sound banking practices. The check was

payable only to Plaintiff but signed only by Attorney Joyner. Truist Bank did not exercise ordinary care in honoring the improperly endorsed check.

50.

As a direct result of such negligent and wrongful conduct by Truist Bank, the life insurance check payable only to Plaintiff, was endorsed, negotiated and converted by Attorney Joyner when Truist processed the deposit of the check into the Law Firm account.  Thereafter, Truist Bank then allowed and facilitated Attorney Joyner and the Law Firm to withdraw and use all of said funds, depriving Plaintiff from receiving those life insurance proceeds, as well as the interest, and investment and use value of those funds.

51.

As a direct and proximate result of its negligence in accepting and processing the deposit of the life insurance proceeds check and thereafter permitting the withdraw from the bank of those funds belonging to Plaintiff, Truist Bank enabled Law Firm and Attorney Joyner to convert such funds for their own purposes.

## COUNT III

## GROSS NEGLIGENCE

52.

Plaintiff hereby realleges all matters set forth in Paragraphs 1 through 51 of this Complaint and incorporate same as if stated verbatim herein.

53.

Attorney Joyner presented to Truist Bank the check representing the Plaintiff's life insurance proceeds for negotiation as a deposit into the Law Firm IOLTA bank account. The check was endorsed only by Attorney Joyner.  Truist Bank knew that the negotiable instrument was

payable only to Plaintiff, as the Plaintiff was clearly the only payee documented on the check, and Truist Bank had no good faith basis for believing that it had been made payable either to the Law Firm or Attorney Joyner.

54.

Truist Bank never contacted Plaintiff to inquire notify Plaintiff for any reason, including to inquire, investigate, or question the fact that Attorney Joyner endorsed and presented to Truist for deposit a check clearly made payable only to Plaintiff.

55.

Truist Bank accepted and executed Attorney Joyner's request to deposit the life insurance proceeds check into Attorney Joyner's Law Firm IOLTA account, and thereafter allowed Attorney Joyner and the Law Firm to withdraw and use all of said funds, with knowledge that said check was payable only to Plaintiff but endorsed only by Attorney Joyner.  As a result of Truist Bank's acts and omissions, Plaintiff never received the life insurance check proceeds and was deprived of the proceeds, interest, and use of those funds.  The acts and omissions of Truist Bank were in total disregard for the rights of Plaintiff and indifferent to the consequences, and constitute gross negligence pursuant to O.C.G.A. 51-1-4, for which the Plaintiff is entitled to general and special damages, including the imposition of punitive damages as against Truist Bank.

## COUNT IV

## FRAUD

56.

Plaintiff hereby realleges all matters set forth in Paragraphs 1 through 55 of this Complaint and incorporate same as if stated verbatim herein.

57.

By allowing someone other than the payee to endorse, deposit, and draw from the funds they did not belong to them, Truist committed fraudulent acts, which denied the Plaintiff of monies to which he was entitled.

58.

The acts and omissions by Truist Bank described herein constitute actual and constructive fraud in that such conduct prevented the Plaintiff from discovering Truist Bank's conduct including that the life insurance proceeds check made payable solely to him had been deposited by Attorney Joyner without a proper endorsement.

59.

The acts and omissions by Truist Bank alleged herein defrauded the Plaintiff of monies belonging solely to him and aided and abetted Attorney Joyner in the latter's ability to deceive Plaintiff.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, having fully stated his claims against Defendant, Plaintiff prays that the following relief be granted:

a.     that the Court find in favor of Plaintiff and against Defendant with respect to the Counts set forth herein;

b.     that the Court award compensatory damages to Plaintiff in the amount of $905,797.31, plus interest and consequential damages arising from the loss of use of the funds for seven (7) years;

      c.      that the Court award special damages, including imposition of punitive damages,

in amounts to be determined by the enlightened conscious of an impartial jury;

      d.      that the Court award all costs and expenses, including attorneys' fees, to Plaintiff;

      e.      that the Court award any and all other relief deemed just and proper.

This 13th day of September, 2024.

/s/ Richard W. Hendrix
RICHARD W. HENDRIX
Georgia Bar No. 346750

/s/ Oto U. Ekpo
OTO U. EKPO
Georgia Bar No. 327088
Attorney for Plaintiff
Finch McCranie
229 Peachtree St. NE Ste 2500
Atlanta, Ga 30303
Ofc (404) 658-9070
Email: oto@finchmccranie.com

/s/ Robert G. Ballard
Robert G. Ballard, P.C.
One Glenlake Parkway
Suite 700
Atlanta, GA 30328
Ofc.  770.455.1818
Cell  404.723.4224
Email: TheBallardLawFirm.com

# EXHIBIT A



THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND THAT GRADUALLY FADES FROM DARK TO LIGHT—SECURITY FEATURES INCLUDED—DETAILS ON BACK

**ONEAMERICA**
The State Life Insurance Company
P.O. Box 406
Indianapolis, IN 46206

*a OneAmerica® financial partner*

Date : 11/03/17

Check Number
**5108160**
56-583/422

Pay Exactly NINE HUNDRED FIVE THOUSAND, SEVEN HUNDRED NINETY- SEVEN AND 31/100 DOLLARS----------

**\*\*\*905,797.31**
Void After 90 Days

Pay To The Order Of

TRENTON LANE SMITH
SUITE 130
1305 MALL OF GEORGIA BLVD
BUFORD  GA 30519

DTH PROCEEDS OF DENISE D SMITH
S020170727012 05450807390
US BANK   WWW.USBANK.COM
MIAMISBURG, OHIO

⑈05108160⑈   ⑆042205038⑆   130103011271⑈

FEDERAL RESERVE BANK REGULATION CC

For Deposit Only
C David Joyner PC
00000015XXXX
1305 Mall of Georgia Blvd

DO NOT WRITE/SIGN/STAMP BELOW THIS LINE
US POSTION BANK ENDORSEMENT

# EXHIBIT B



**STATE LIFE**
*a OneAmerica*
*financial partner*

November 2, 2017

Trenton Lane Smith
Suite 130
1305 Mall Of Georgia Blvd
Buford GA 30519

Insured : Denise D. Smith          Voucher # :  AC30600014/IN
Owner: Denise D. Smith
Policy #:05450007390                Claim #:SD-20170727-012

Dear Mr. Trenton Lane Smith:

We have completed our processing of this claim for insurance benefits payable under this policy.

As beneficiary of this policy's proceeds, 100% of this benefit is payable to you.  A detailed explanation of benefits is attached.  Total proceeds payable are $905,797.31.

Your check will be sent under separate cover.

If you are interested in additional quality insurance protection or other services offered, please contact the home office.

*The State Life*          The State Life Insurance Company has been pleased to have been of assistance to you
*Insurance Company*       in your time of need.  If you have any further questions regarding your claim, please call me
*P.O. Box 6008*           on our toll free number, 1-800-833-5569 or 1-317-285-1589.
*Indianapolis, IN 46206-6008*
*Telephone (800) 833-5569*   Sincerely,
*Fax (317) 285-1344*

Regina K. Little
Individual Claims

Insured:  Denise D. Smith

Beneficiary:  Trenton Lane Smith

Policy #: 05450007390

Claim #: SD-20170727-012

|  | |
|---|---|
| Universal Life | $ 1,000,000.00 |
| Loan | 103,610.57- |
| Loan Interest | 3,470.25- |
|  | ---------------- |
| Net Proceeds | $ 892,919.18 |
| Payable at 100% | 892,919.18 |
| Interest on Proceeds 4.50% | 12,878.13* |
|  | ---------------- |
| Total Proceeds | $ 905,797.31 |

Remarks:
\* Please be advised the interest on proceeds may be taxable income to be reported to you.  On any taxable interest over $10.00, we will send a 1099 tax form at the end of the year.

AC30600014/IN

# EXHIBIT C

FILED

## LAST WILL AND TESTAMENT

### OF

### DENISE DIANE SMITH

2017 AUG 15 PH 1:46

FORSYTH COUNTY, GEORGIA
PROBATE COURT

I, DENISE DIANE SMITH , of Suwanee, Gwinnett County, Georgia, hereby revoke all Wills and Codicils previously made by me, and declare this to be my Last Will and Testament.

### ITEM I

### IDENTITY OF HUSBAND AND CHILDREN

I am not married, and have one (1) child, who is now living, whose name is:

TRENTON LANE SMITH

### ITEM II

### PROPERTY BEING DISPOSED

It is my intention to dispose of all of the real and personal property which I may own which is subject to the control of the Will. However, I do not intend to exercise any power of appointment which I now possess or which may hereafter be conferred on me, unless such power is specifically referred to herein or in any Codicil hereto.

### ITEM III

### TANGIBLE PERSONAL PROPERTY

All of my personal effect, automobiles, books, clothing, jewelry, and other such tangible personal property owned by me at the time of my death I give to my son, TRENTON LANE SMITH, per stirpes, with TRACIE RONZULLI as his executor, designated upon the terms and conditions listed in Item IV, until he attains thirty-five (35) years of age. When he attains twenty-five (25) years of age, ten percent (10%) of said property will be distributed to him with the remaining ninety percent (90%) to be held until he attains thirty-five (35) years of age. When he attains thirty-five (35) years of age, the remaining property will be distributed to him.

2017-ES-0324
WILLSUB
Will Submitted for Probate
1424151

1

## ITEM IV

### DISPOSITION OF RESIDUARY ESTATE

All of the rest, residue, and remainder of my property of whatsoever kind and character, real or personal or mixed, wheresoever located, of which I may die seised or possessed or in which I may own any interest, or to which my estate may become entitled after my death, but excluding any property over which I have a power of appointment, I give, bequeath, and devise to my son, TRENTON LANE SMITH, per stirpes, with TRACIE RONZULLI as his executor, designated upon the terms and conditions listed in Item IV, until he attains thirty-five (35) years of age. When he attains twenty-five (25) years of age, ten percent (10%) of said property will be distributed to him with the remaining ninety percent (90%) to be held until he attains thirty-five (35) years of age. When he attains thirty-five (35) years of age, the remaining property will be distributed to him. If any of my living children are less than twenty-five (25) years of age, I give, bequeath and devise such property to TRACIE RONZULLI as executor hereinafter designated upon the following terms and conditions:

(a) My Executor shall hold and administer the trust property, collect the income therefrom, and shall pay to or use for the benefit of my living children so much of the net income as it deems necessary for their support, maintenance, care and education, taking into consideration the needs of each beneficiary and any other known means of support that may be available to any such beneficiary. The payment or expenditure of net income to or for the beneficiaries need not be equal, but may be in such amounts and proportions as my Executor may determine in its discretion to be consistent with their respective needs. It is my desire, however, that insofar as is consistent with the circumstances, the income be paid or used in equal shares for my living children. Any income not so used shall be accumulated and added to the corpus of this trust. During the administration of my estate the income earned by the property included in this trust shall be considered income of this trust and subject to distribution as hereinafter provided.

(b) My Executor shall have the power, in its discretion, to encroach upon the corpus of the trust estate in such amounts and at such times as it may deem necessary to provide for the support, maintenance, care and education of any one or more of the beneficiaries, taking into consideration the needs of each beneficiary and any other known means of support that may be available to any such beneficiary. Any encroachment for the professional or postgraduate education of a beneficiary shall be charged without interest against the share ultimately set aside for such beneficiary or the beneficiary's descendants.

2

(c)  When my youngest living child attains twenty-five (25) years of age, ten percent (10%) of said property will be distributed to him with the remaining ninety percent (90%) to be held until he attains thirty-five (35) years of age.  When he attains thirty-five (35) years of age, the remaining property will be distributed to him.  When my youngest living child shall have attained the age of thirty-five (35) years or all of my children shall have sooner died, the trust shall terminate and the corpus then remaining shall be divided and terminate and the corpus then remaining shall be divided and distributed in equal shares between my living children with an equal share, per stirpes.

(d)  The term "education" as used in the will shall be deemed to include college, postgraduate, and professional education and technical and vocational training.

## ITEM V

### GENERAL

### Effect of Inoperative, Invalid, or Illegal Provision

If any provision of this Will or of any Codicil thereto is held to be inoperative, invalid, or illegal, it is my intention that all of the remaining provisions thereof shall continue to be fully operative and effective so far as is possible and reasonable.

### Headings

The headings above the various provisions of this Will have been included only in order to make it easier to locate the subject covered by each provision and are not to be used in construing this Will or in ascertaining my intentions.

### Guardian of Person

I appoint TRACIE RONZULLI as executor of the person of any minor child of mine.

## ITEM VI

### EXECUTOR

### Appointment

I appoint RUBY MARTHA SMITH as Executor of my estate.  If she is unable or unwilling to serve, I appoint as substitute or successor executor TRACIE RONZULLI as Executor.

3

## Waiver of Bond and Accounting

No bond or other security shall be required of any Executor appointed in this Will.  The Executor shall be exempt from filing any inventory and from filing any final settlement in any court for cause shown.

## Powers

My Executor shall have, in addition to and not in limitation of the power given by law or by other provisions of this Will, the following powers with respect to the settlement of my estate, to be exercised in each case from time to time in the discretion of my Executor without further order of any court:

### General

(1)   Power to retain any property, including capital stock of my Corporate Executor, pending distribution hereunder, to invest in or purchase any property without restriction to legal investments for fiduciaries, to distribute property in kind, to compromise claims, and to sell any property at public or private sales.

### Investments

(2)   To invest and reinvest in stocks, shares, and obligations of corporations, of unincorporated associations or trusts, and of investment companies or in any other kind of personal or real property, notwithstanding the fact that any or all of the investments made are of a character or size which but for this expressed authority would not be considered proper for executors.

### Sell and Exchange

(3)   To sell for cash or on deferred payments at public or private sale, to exchange, and to convey any portion of my estate, real, personal, or mixed at the time or price and on the terms and conditions which my Executor may determine.

### Leases

(4)   To lease any real or personal property of my estate for any purpose for terms within or extending beyond the term of the settlement of my estate in accordance with the law.

4

### Property Management

(5)  To manage, control, improve, and repair real and personal property belonging to my estate.

### Insurance

(6)  To procure and carry at the expense of my estate insurance of the kinds, forms, and amounts deemed advisable by my Executor to protect my estate and my Executor against any hazard.

### Enforcement of Mortgages

(7)  To enforce any mortgage, deed of trust, or pledge held by my estate and to purchase at any sale thereunder any property subject to any such mortgage or pledge.

### Conduct Business

(8)  To conduct alone or with others any business in which I am engaged or in which I have an interest at my death, with all the powers of any owner with respect thereto, including the power to delegate discretionary duties to others, to invest other property held hereunder in such business, and to organize a partnership or corporation to carry on such business.

### Securities

(9)  To vote or issue proxies, with power of substitution, for stocks, bonds, or other securities; to enter into or oppose any plan of merger, liquidation, lease, sale, mortgage, consolidation, reorganization, or foreclosure, and in connection therewith to pay amounts due under such plan, deposit securities, and delegate discretionary powers to an agent or protective committee; and to exercise, buy, or sell rights of conversion or subscription.

### Borrow Money

(10) To borrow money, with or without interest for the benefit of my estate, and to pledge or mortgage property as security therefor.

### Claims

(11) To arbitrate, defend, enforce, release, compromise, or settle any claim of or against my estate.

5

### Divisions or Distributions

(12) To make any division or distribution in cash or in kind, and to allocate the same or different property or undivided interests in property to any share in any such division or distribution. For purposes of division or distribution, property shall be valued at the fair market value current at the date of division or distribution.

### Instruments

(13) To execute and deliver all necessary or proper deeds or other instruments.

### Litigation

(14) To commence or defend at the expense of my estate any litigation affecting my estate deemed advisable by my Executor.

### Distributions to Trust Beneficiaries

(15) Until the Trusts herein created are established, I authorize my Executors, in their sole and absolute discretion, from time to time and at any time, to pay out of my general estate to the respective beneficiaries of such Trusts, such sum or sums as in their judgment is not in excess of the amounts which such beneficiaries would probably have been entitled to receive from the said Trusts had the same been established.

The above powers and any other powers given under this Will or by law may be exercised without court approval. All such powers shall be exercised by my Executor as he deems prudent and subject to his fiduciary obligations. No purchaser from or other party dealing with my Executor shall be responsible to see to the application of any money or other property paid or delivered to him.

### PAYMENTS OF DEBTS, EXPENSES, AND TAXES

I direct my Executor to pay from the residue of my estate (1) all debts allowed as claims against my estate, (2) my funeral expenses, (3) all expenses of administration of my estate, and (4) all estate, inheritance, succession, and transfer taxes (together with interest and penalties thereon, if any) which may be assessed by reason of my death, and with respect to property of every kind and description, whether or not passing under this Will. My Executor shall not receive reimbursement for any such payment from any person or property.

6

### Elections

My Executor, with or without consideration, may consent to gifts made by my Executor or her estate, and may incur liability or receive refund or credit for my estate with respect to any such taxes and interest and penalties thereon.  My Executor shall select the time for the valuation of the property in my gross estate for state and federal estate tax purposes.  My Executor shall use administration expenses as income tax deductions and/or as estate tax deductions at her discretion, and shall make no consequent adjustment of income and principal accounts.  Any decision made by my Executor under this paragraph shall be conclusive on all persons, and no person shall be entitled to reimbursement or contribution by reason thereof, whether or not any distribution to such person hereunder shall be diminished thereby.

### ITEM VII

### SURVIVORSHIP REQUIREMENT

Should any person or persons who would take under this Will, but for this provision, fail to survive me by more than ninety (90) days, such person or persons shall be deemed to have predeceased me for the purpose of construing all the terms of this Will.

### ITEM VIII

### PROVISION FOR AVOIDING RULE AGAINST PERPETUITIES

In the event that under the provisions of this Will absolute vesting of any interest in a trust or share thereof is declared beyond the period allowed by law, then I declare that upon the termination of the longest time or upon the happening of the latest event permitted by law after my death or after the death of my children and grandchildren who may be living at my death, the said interest shall vest absolutely in and shall be forthwith distributable in and to the person or persons who is or are the beneficiary or beneficiaries thereof and in the proportion in which each is a beneficiary thereof, whatever his, her, or their attained ages or marital status.

### ITEM IX

### DEFINITIONS

Where necessary or appropriate to the meaning hereof, the singular and plural shall be interchangeable, and words of any gender shall include all genders.  "Children," "descendants," and words of similar purport include persons whose relationship to

7

the ancestor designated is created by or through lawful birth or adoption, whenever occurring. No child or descendant shall lose his status as such through adoption by another person. A person in gestation, which person is later born alive, shall be regarded in this Will as a person in being during the period of gestation.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on this the 13th day of _____MAY_____, 1998, and have set my hand on the __8__ pages along the bottom thereof, hereby declaring the instrument contained on these __8__ pages to be my Last Will and Testament.

_____ (SEAL)
DENISE DIANE SMITH

The foregoing instrument was signed, sealed, published, and declared by DENISE DIANE SMITH, to be her Last Will and Testament in our presence, and we at her request and in her presence and in the presence of each other, have hereunto set our signatures as attesting witnesses on the day the same bears date.

165 West Wieuca, Suite 206
Atlanta, GA  30342

_____
(SIGNATURE)

165 West Wieuca, Suite 206
Atlanta, GA  30342

_____
(SIGNATURE)

8

# EXHIBIT D

# *THE*
# *STATE LIFE*
# *INSURANCE COMPANY*
## A MUTUAL COMPANY * FOUNDED 1894

| | | | |
|---|---|---|---|
| **Name of Insured:** | Denise D Smith | **Policy Number:** | 5450007390 |
| **Date of Issue:** | 01/27/2004 | **Sum Insured:** | $1,000,000.00 |

The State Life Insurance Company (State Life) will pay a death benefit on receipt at the Home Office of due proof of the Insured's death while the policy is in force and before the Maturity Date. State Life will pay the surrender value to the Owner if the Insured is living on the Maturity Date. Payment is subject to the terms of this policy.

This policy is a legal contract between the Owner and The State Life Insurance Company. It is issued in consideration of the application and payment of the first premium.

## NOTICE OF 20-DAY RIGHT TO EXAMINE POLICY

Within 20 days of receipt of this policy, the Owner may cancel it by returning it to State Life or the agent through whom it was purchased. The policy will be deemed void from the beginning as soon as it is mailed or delivered. Any premium paid will be refunded. *Please read your policy carefully.*

Signed for State Life as of the Date of Issue. Policy Years and policy anniversaries will be computed from this date.

President

Secretary

**THE STATE LIFE INSURANCE COMPANY**
**One American Square, P.O. Box 406**
**Indianapolis, IN 46206**

# *ADJUSTABLE LIFE INSURANCE POLICY*

Death Benefit Payable Prior to Maturity. Surrender Value Payable at Maturity.
L-260R Adjustable Death Benefit. Flexible Premiums Payable Until Maturity or Prior Death. Participating.

## INDEX

Account Value .................................................................................... 13
Assignment ...................................................................................... 7
Basis of Computations ...................................................................... 15
Cash Value ...................................................................................... 14
Changes .......................................................................................... 6
Compliance with Tax Laws ................................................................ 8
Continuation of Insurance Guarantee .................................................. 9
Cost of Insurance ............................................................................ 14
Data Page ....................................................................................... 3
Death Proceeds ............................................................................... 6
Death Benefit Options ...................................................................... 6
Definitions ...................................................................................... 2A
Dividends ........................................................................................ 12
General Provisions ........................................................................... 7
Grace Period ................................................................................... 12
Incontestability ............................................................................... 7
Initial Specified Amount ................................................................... 3
Maturity Date .................................................................................. 6
Minimum Specified Amount .............................................................. 3
Owner and Beneficiary ..................................................................... 7
Partial Withdrawal ........................................................................... 15
Planned Premium ............................................................................. 3
Policy Loans .................................................................................... 13
Policy Values ................................................................................... 13
Premiums ........................................................................................ 12
Proceeds ......................................................................................... 6
Reinstatement ................................................................................. 12
Settlement Options .......................................................................... 9
Surrender ........................................................................................ 14
Table of Death Benefit as Percentage of Account Value ...................... 5
Table of Guaranteed Maximum Insurance Rates ................................. 4A
Table of Guaranteed Values .............................................................. 4
Table of Surrender Charges ............................................................... 3
Termination ..................................................................................... 9

The application and any riders follow page 15.

## DEFINTIONS

"attained age" means age at nearest birthday at the beginning of the policy year.

"dividend credits" means:
1. any dividend accumulations; plus
2. any dividend that has not been applied under a dividend option.

"Guarantee Period" means the period shown on the Data Page during which the policy will remain in force if cumulative premiums, less any outstanding loan and loan interest and partial withdrawals, equal or exceed the Required Premium for the Guarantee Period. The Guarantee Period terminates on any Monthly Deduction Date that the test fails.

"loan value" means:
1. the policy's cash value; plus
2. any dividend credits

"Monthly Deduction Day" means the same day of each month as the Date of Issue.

"Monthly Administrative Charge" means the sum of the policy fee and the monthly specified amount charge shown on the Data Page.

"net premium" means the premium paid less any policy fee or charge shown on the Data Page.

"Required Premium for the Guarantee Period" means the amount that must be paid on a cumulative basis to keep this policy in force during the Guarantee Period.

"policy debt" means all unpaid loans on this Policy.

"settlement date" means the date on which amounts payable on death or surrender would be paid if paid in a lump sum.

"surrender value" means:
1. the policy's cash value; plus
2. any dividend credits; less
3. any policy debt.

"written notice" means a written notice signed by the Owner. It must be in a form satisfactory to State Life and received at the Home Office.

# DATA PAGE

**MATURITY DATE\*:** 01/27/2057

| | | | |
|---|---|---|---|
| **NAME OF INSURED** | **AGE** | **SEX** | **PREMIUM, CLASS** |
| Denise D Smith | 47 | Female | Standard, Non-Tobacco |
| **POLICY NUMBER** | | **DATE OF ISSUE** | |
| 5450007390 | | 01/27/2004 | |

\* The Maturity Date is the policy anniversary nearest the insured's 100th birthday. Coverage may expire prior to the maturity date shown if no premiums are paid after the initial premium or if subsequent premiums are insufficient to continue coverage to that date.

## POLICY AND POLICY CHARGE SPECIFICATIONS

**INITIAL SPECIFIED AMOUNT:** $1,000,000.00

**PLANNED PREMIUM:** $1,082.36 Monthly

**TARGET PREMIUM:** $15,600.00

**MONTHLY REQUIRED PREMIUM FOR THE GUARANTEE PERIOD:** $275.58

**PREMIUM CHARGE:** 5% of all premiums paid

**MONTHLY ADMINSTRATIVE CHARGE**
**POLICY FEE:** Current: $5.00
Guaranteed: $10.00

**MONTHLY SPECIFIED AMOUNT CHARGE:**

| Policy Years | |
|---|---|
| 1-5 | $110.00 |
| 6-15 | $80.00 |
| 16+ | $.00 |

**DEATH BENEFIT OPTION:** A
**GUARANTEE PERIOD:** 10 Years

## POLICY MINIMUM AND LOAN SPECIFICATIONS

**MINIMUM SPECIFIED AMOUNT:** $50,000.00    **LOAN INTEREST RATE:** 7.50%

**INTEREST RATE CREDITED ON LOANS:** 4.00%

## TABLE OF SURRENDER CHARGES
### Surrender Charge as % of Target Premium

| Policy Year | Surrender Charge | Policy Year | Surrender Charge |
|---|---|---|---|
| 1 | 100% | 9 | 60% |
| 2 | 100% | 10 | 50% |
| 3 | 100% | 11 | 40% |
| 4 | 100% | 12 | 30% |
| 5 | 100% | 13 | 20% |
| 6 | 90% | 14 | 10% |
| 7 | 80% | 15 and thereafter | 0% |
| 8 | 70% | | |

## DATA PAGE

### RIDER SUMMARY

| FORM NUMBER | DESCRIPTION OF INSURANCE COVERAGES | AMOUNT OF INSURANCE | RATING FACTOR | EXPIRY DATE |
|---|---|---|---|---|
| R480 | Maturity Date Extension Rider | N/A | N/A | 01/27/2057 |

## DATA PAGE

### TABLE OF GUARANTEED VALUES

| POLICY YEAR | ACCOUNT VALUE | CASH VALUE | POLICY YEAR | ACCOUNT VALUE | CASH VALUE |
|---|---|---|---|---|---|
| 1 | $7,677.27 | $0.00 | 11 | $88,803.81 | $82,563.81 |
| 2 | $15,447.14 | $0.00 | 12 | $96,946.46 | $92,266.46 |
| 3 | $23,307.41 | $7,707.41 | 13 | $105,047.16 | $101,927.16 |
| 4 | $31,226.57 | $15,626.57 | 14 | $113,039.00 | $111,479.00 |
| 5 | $39,192.11 | $23,592.11 | 15 | $120,835.42 | $120,835.42 |
| 6 | $47,540.87 | $33,500.87 | 16 | $129,270.39 | $129,270.39 |
| 7 | $55,869.31 | $43,389.31 | 17 | $137,218.55 | $137,218.55 |
| 8 | $64,173.94 | $53,253.94 | 18 | $144,504.91 | $144,504.91 |
| 9 | $72,432.31 | $63,072.31 | 19 | $151,025.61 | $151,025.61 |
| 10 | $80,640.51 | $72,840.51 | 20 | $156,670.26 | $156,670.26 |

Values at any time depend on when premiums are paid, the amount of interest credited, and the Cost of Insurance Charges actually made. The amounts will be determined under the terms of the policy; however, the values above show the guaranteed amounts resulting from payment of the Planned Premium at the beginning of the policy year with interest and Cost of Insurance charges at the rates guaranteed.

The values assume all Planned Premiums for the stated period have been paid, there is no policy debt and there are no dividends. Values for periods not shown will be given on request.

**DATA PAGE**

## Schedule of Guaranteed Maximum Cost of Insurance Rates
Monthly Rate Per $1,000 of Death Benefit

| Attained Age | Rate | Attained Age | Rate | Attained Age | Rate | Attained Age | Rate |
|---|---|---|---|---|---|---|---|
| 0 | 0.24083 | 25 | 0.09083 | 50 | 0.34916 | 75 | 3.11000 |
| 1 | 0.07250 | 26 | 0.09333 | 51 | 0.37500 | 76 | 3.50333 |
| 2 | 0.06750 | 27 | 0.09500 | 52 | 0.40416 | 77 | 3.92583 |
| 3 | 0.06583 | 28 | 0.09750 | 53 | 0.43833 | 78 | 4.37750 |
| 4 | 0.06416 | 29 | 0.10000 | 54 | 0.47333 | 79 | 4.87083 |
| 5 | 0.06333 | 30 | 0.10333 | 55 | 0.51083 | 80 | 5.42666 |
| 6 | 0.06083 | 31 | 0.10583 | 56 | 0.54916 | 81 | 6.06333 |
| 7 | 0.06000 | 32 | 0.10916 | 57 | 0.58750 | 82 | 6.79916 |
| 8 | 0.05833 | 33 | 0.11250 | 58 | 0.62416 | 83 | 7.64666 |
| 9 | 0.05750 | 34 | 0.11833 | 59 | 0.66333 | 84 | 8.58583 |
| 10 | 0.05666 | 35 | 0.12250 | 60 | 0.70916 | 85 | 9.61500 |
| 11 | 0.05750 | 36 | 0.13000 | 61 | 0.76333 | 86 | 10.71500 |
| 12 | 0.06000 | 37 | 0.13916 | 62 | 0.83166 | 87 | 11.89250 |
| 13 | 0.06250 | 38 | 0.14916 | 63 | 0.91750 | 88 | 13.13416 |
| 14 | 0.06666 | 39 | 0.16083 | 64 | 1.01916 | 89 | 14.45916 |
| 15 | 0.07000 | 40 | 0.17333 | 65 | 1.12916 | 90 | 15.86583 |
| 16 | 0.07333 | 41 | 0.18833 | 66 | 1.24750 | 91 | 17.38166 |
| 17 | 0.07666 | 42 | 0.20333 | 67 | 1.36750 | 92 | 19.05000 |
| 18 | 0.07916 | 43 | 0.21833 | 68 | 1.48833 | 93 | 20.95000 |
| 19 | 0.08166 | 44 | 0.23333 | 69 | 1.61750 | 94 | 23.27583 |
| 20 | 0.08416 | 45 | 0.24916 | 70 | 1.76666 | 95 | 26.44333 |
| 21 | 0.08500 | 46 | 0.26583 | 71 | 1.94500 | 96 | 31.31166 |
| 22 | 0.08666 | 47 | 0.28416 | 72 | 2.16583 | 97 | 39.58083 |
| 23 | 0.08750 | 48 | 0.30416 | 73 | 2.43500 | 98 | 54.65416 |
| 24 | 0.09000 | 49 | 0.32500 | 74 | 2.75166 | 99 | 83.33333 |

If a percentage is shown on the Data Page after the rating class, multiply the appropriate rate above by that percentage. These rates are based on the Commissioners 1980 Standard Ordinary Mortality Table, at age nearest birthday, sex and tobacco distinct.

**DATA PAGE**

## TABLE OF DEATH BENEFIT AS PERCENTAGE OF ACCOUNT VALUE

| Insured's Attained Age at Beginning of Policy Year in Which Death Occurs | % of Account Value on Date of Death | Insured's Attained Age at Beginning of Policy Year in Which Death Occurs | % of Account Value on Date of Death |
|---|---|---|---|
| 0-40 | 250 | 70 | 115 |
| 41 | 243 | 71 | 113 |
| 42 | 236 | 72 | 111 |
| 43 | 229 | 73 | 109 |
| 44 | 222 | 74 | 107 |
| 45 | 215 | 75 | 105 |
| 46 | 209 | 76 | 105 |
| 47 | 203 | 77 | 105 |
| 48 | 197 | 78 | 105 |
| 49 | 191 | 79 | 105 |
| 50 | 185 | 80 | 105 |
| 51 | 178 | 81 | 105 |
| 52 | 171 | 82 | 105 |
| 53 | 164 | 83 | 105 |
| 54 | 157 | 84 | 105 |
| 55 | 150 | 85 | 105 |
| 56 | 146 | 86 | 105 |
| 57 | 142 | 87 | 105 |
| 58 | 138 | 88 | 105 |
| 59 | 134 | 89 | 105 |
| 60 | 130 | 90 | 105 |
| 61 | 128 | 91 | 104 |
| 62 | 126 | 92 | 103 |
| 63 | 124 | 93 | 102 |
| 64 | 122 | 94 | 101 |
| 65 | 120 | 95 | 100 |
| 66 | 119 | 96 | 100 |
| 67 | 118 | 97 | 100 |
| 68 | 117 | 98 | 100 |
| 69 | 116 | 99 | 100 |
|  |  | 100 | 100 |

## PROCEEDS PROVISIONS

**DEATH PROCEEDS.** On the Insured's death, State Life will pay the death proceeds to the beneficiary. The death proceeds will equal:
1. the Death Benefit as provided under the Death Benefit Options listed below; plus
2. any dividend credits; less
3. any policy debt; less any past due Cost of Insurance if the Insured dies during the grace period.

**PAYMENT.** State Life will pay the death proceeds promptly on receipt of due proof of the Insured's death. Payment is payable at the Home Office. Interest will be paid on the death proceeds from the date of death to the date the death proceeds are paid or applied under a Settlement Option. The interest rate will be the greater of the rate State Life is then paying on proceeds left at interest under Settlement Option 1 and any rate required by the state in which this policy is delivered.

**RIDER PROCEEDS.** State Life will pay the proceeds to be paid on the death of any person insured by rider as provided in the rider

**MATURITY DATE.** On the Maturity Date, if the policy is in force, State Life will pay the surrender value to the Owner. The Maturity Date is shown on the Data Page. It is the last date insurance coverage can remain in force. Coverage will end prior to the Maturity Date if the premiums paid and interest credited are not great enough to continue coverage to that date.

**DEATH BENEFIT OPTIONS.** This policy offers two death benefit options. The option for this policy is shown on the Data Page.
**Option A (Basic).** The Specified Amount includes the Account Value. The Death Benefit will be the greater of:
1. the Specified Amount on the date of death; and
2. the applicable percentage of the Account Value at the date of death. This percentage will be determined from the Table of Death Benefit as Percentage of Account Value.

**Option B (Basic Plus Account Value).** The Account Value will be added to the Specified Amount. The Death Benefit will be the greater of:
1. the Specified Amount plus the Account Value on the date of death; and
2. the applicable percentage of the Account Value as the date of death. This percentage will be determined from the Table of Death Benefit as Percentage of Account Value.

**CHANGES.** The Owner may make changes in the policy by sending a written request to the Home Office. State Life will not allow a change if the change would disqualify the policy as life insurance under federal tax law. State Life will send a supplemental Data Page when a change is made.

**INCREASE IN AMOUNT.** A supplemental application must be submitted to increase the Specified Amount. Evidence of insurability satisfactory to State Life will be required. The Account Value must be great enough to cover the next Cost of Insurance deduction.

**DECREASE IN AMOUNT.** The Specified Amount cannot be decreased below the Minimum Specified Amount. The decrease will first be applied against any increases in reverse order in which they occurred, and then against the coverage originally applied for.

## PROCEEDS PROVISIONS

**CHANGE IN DEATH BENEFIT OPTION.** The Owner may change the Death Benefit Option. If the Change is from Option A to Option B, the Specified Amount after the change will be:

1. the Specified Amount prior to the change; less
2. the Account Value at the date of change.

Evidence of insurability satisfactory to State Life will be required.

If the change is from Option B to Option A, the Specified Amount after the change will be:

1. the Specified Amount prior to the change; plus
2. the Account value at the date of change. Evidence of insurability will not be required.

## GENERAL PROVISIONS

**THE CONTRACT.** This policy (including any riders, the application and any supplemental applications and Data Pages) is the entire contract. All statements made in an application will, in the absence of fraud, be deemed representations and not warranties. A statement will not be used to void the policy or defend against a claim unless it is contained in an application and attached to the policy. Only the President, a Vice President or the Secretary has authority to change the policy or waive any of State Life's rights or requirements, and then only in writing.

**OWNER AND BENEFICIARY.** The Owner is the owner named in the application, unless changed. While the Insured is living, the Owner may exercise all the rights given by the policy without the consent of any revocable beneficiary. All beneficiaries are revocable unless the Owner gives State Life written notice to the contrary. The beneficiary is as stated in the application, unless changed. The Owner may change the owner or any revocable beneficiary by filing a written notice. An irrevocable beneficiary may be changed only with that beneficiary's written consent. On approval by State Life, the change will take effect as of the date the notice was signed, subject to any action taken by State Life before notice was received. Changing the Owner does not change the beneficiary. If more than one beneficiary is named, those surviving the Insured will share equally unless otherwise stated. If no beneficiary survives the Insured, the death proceeds will be paid to the Owner, if living, otherwise to the Owner's estate. The rights of any revocable beneficiary are subject to the rights of any assignee of record.

**ASSIGNMENT.** State Life will not be bound by any assignment until it is filed at the Home Office. State Life will not be responsible for the validity of any assignment.

**INCONTESTABILITY.** This policy as originally issued will be incontestable after it has been in force during the lifetime of the Insured for 2 years from the Date of Issue. Any increase in coverage or any reinstatement will be incontestable after the increase or reinstatement has been in force during the lifetime of the Insured for 2 years from the Date of Issue. Any contest will be based only on application for the increase or reinstatement.

**SUICIDE.** If the Insured dies by suicide, while sane or insane, within 2 years after the Date of Issue, the death proceeds will be:

1. the amount of premiums paid; less
2. the cost of any riders; less
3. any policy debt; less
4. any partial withdrawals.

# GENERAL PROVISIONS

If the Insured dies by suicide, while sane or insane, within 2 years after the effective date of any increase in coverage or any reinstatement, State Life's total liability with respect to the increased coverage or reinstatement will be the Cost of Insurance for the increased or reinstated amount.

**MISSTATEMENT OF AGE OR SEX.** If the age or sex of the Insured or any person covered under a rider has been misstated, any benefits payable will be those which would be purchased by the most recent Cost of Insurance charge at the correct age and sex.

**EFFECTIVE DATES.** All coverage provided by the original application will take effect on the Date of Issue. Any increase in or additional coverage will take effect on the Monthly Deduction Day on or next following the date the increase or addition is approved. Any reinstated coverage will take effect on the Monthly Deduction Day on or next following the date the reinstatement is approved. Any decrease in coverage will take effect on the Monthly Deduction Day on or next following the date the request for decrease is received at the Home Office.

**CHANGE OF PLAN.** The Owner may make changes in this policy or exchange it for another plan, if State Life consents. An added premium and evidence of insurability satisfactory to State Life may be required.

**REPORTS.** State Life will send a report to the Owner at least once each year. The report will show the current Account Value, surrender value and Death Benefit and any current policy loans. It also will show activity since the last report, including:

1. premiums paid;
2. interest credited;
3. all expense charges;
4. partial withdrawals; and
5. loan activity.

The report will also show any other information required by the state in which the policy is delivered.

State Life will provide a projection of future benefits and values, on the Owner's written request. A reasonable fee may be charged for this report. The report will be based on assumptions with regard to:

1. the Death Benefit(s) specified by the Owner;
2. Planned Premiums specified by the Owner;
3. any other assumptions needed and specified by the Owner or State Life.

**COMPLIANCE WITH TAX LAWS AND RIGHT TO AMEND.** State Life reserves the right to amend this policy so that it will remain qualified for treatment as a life insurance contract under Sections 101(f) and 7702 of the Internal Revenue Code of 1954, as amended, and any rulings or regulations published by the Internal Revenue Service.

State Life will send a copy of any amendment to the Owner.

**ANNUAL MEETING.** While this policy is in force, the Owner is a member of State Life. Members have the right to vote at the annual meeting. It is held at the Home Office on the third Thursday of each January at 2:00 P.M. EST.

## GENERAL PROVISIONS

**TERMINATION.** All coverage under this policy will terminate on the first to occur of:

1. the end of the grace period;
2. surrender of the policy;
3. death of the Insured;
4. maturity of the policy.

**CONTINUATION OF INSURANCE GUARANTEE.** During the Guarantee Period shown on the Data Page, the policy will remain in force and will not begin the grace period if on each Monthly Deduction Date, the sum of the premiums paid to date, less any partial withdrawals, and any outstanding loan and loan interest, equals or exceeds the Required Premium for the Guarantee Period multiplied by the number of policy months since the Date of Issue. If this test is failed on any Monthly Deduction Date, the Continuation of Insurance Guarantee terminates. The guarantee will not be reinstated.

The Required Premium for the Guarantee Period is shown on the Data Page. If you make changes to the policy within the Guarantee Period, the Required Premium for subsequent months may change. We will send you notice of the new Required Premium.

## SETTLEMENT PROVISIONS

**ELECTION.** Amounts payable on death or surrender may be paid under a Settlement Option, instead of in one sum. The Owner may choose or change an option at any time before the Insured's death by filing a written request at the Home Office. If no option is in effect at the Insured's death, the beneficiary may choose an option.

**OPTIONS:**

1. **Interest.** The proceeds are left with State Life, at interest. The interest rate is 4 1/2% per year. The proceeds may be left during the life of the payee or for a period of not more than 30 years.
   a. Paid. Interest is paid every 1, 3, 6, or 12 months, as chosen, on the proceeds left; or
   b. Accumulate. Interest accumulates on the proceeds left, including interest earned before.
2. **Limited Payments.** Payments are made each month until the proceeds are exhausted. Payments cannot be made for more than 30 years. Interest will be paid on the remaining proceeds. The interest rate is 4 1/2% per year.
   a. Fixed Amount. Payments will be made each month in the amount chosen, until the proceeds and interest are paid out; or
   b. Fixed Period. Payments will be made each month for the period chosen. See the Option 2b Table for details.
3. **Life Payments.** Payments will be made each month for as long as the payee lives. A guaranteed period for payments of 10 or 20 years may be chosen. The payment amount will be based on the sex and insuring age of the payee on the settlement date. See the Option 3 Table for details.
4. **Joint and Survivor Payments.** Payments will be made each month to 2 payees. The payees must be named at the time this option is chosen. The payments will be made while both are living. On the death of either payee, payments of 2/3 of the original payment will be made for the rest of the survivor's life. The payment amount will be based on the sex and insuring age of each payee on the settlement date. See the Option 4 Table for details.
5. **Other options** may be arranged with State Life's consent.

## SETTLEMENT PROVISIONS

Interest under Option 1 will accrue from the settlement date. The first payment under Options 2, 3, and 4 will be made as of the settlement date.

**LIMITATIONS.**
1. To choose an option, the amount of proceeds to be applied must be at least $2,500.
2. Each payment must be at least $100. If the payment is less than $100, State Life may require that payments are made on a less frequent basis.
3. The payee must be the Insured or the beneficiary, unless State Life agrees to some other payee.
4. If the payee is not an individual acting in his own behalf, an option cannot be chosen without State Life's consent.

**FINAL PAYMENT.** On the death of the last payee, State Life will pay to the payee's estate the present value at the contract rate of interest of any amounts owing under an option.

**CURRENT SETTLEMENT OPTIONS.** The proceeds will be applied under State Life's current settlement options in effect on the settlement date, if they provide larger payments than those guaranteed under the options above.

**PROTECTION OF PAYMENT.** As far as the law permits, no amounts paid or held by State Life under an option will be subject to the claims of creditors or to legal process.

**EXTRA INTEREST.** State Life may pay extra interest on amounts held under these options. Each year State Life will determine the amount, if any, and how it will be paid.

## SETTLEMENT OPTION TABLES

SETTLEMENT OPTION TABLES
MONTHLY PAYMENT PER $1,000 PROCEEDS

|   | YEARS | PAYMENT | YEARS | PAYMENT |
|---|-------|---------|-------|---------|
|   | 1 | $85.02 | 16 | $7.24 |
|   | 2 | 43.45 | 17 | 6.95 |
| O | 3 | 29.60 | 18 | 6.69 |
| P | 4 | 22.68 | 19 | 6.46 |
| T | 5 | 18.53 | 20 | 6.25 |
| I | 6 | 15.77 | 21 | 6.07 |
| O | 7 | 13.81 | 22 | 5.90 |
| N | 8 | 12.34 | 23 | 5.75 |
|   | 9 | 11.19 | 24 | 5.61 |
| 2 | 10 | 10.28 | 25 | 5.49 |
| b | 11 | 9.54 | 26 | 5.37 |
|   | 12 | 8.92 | 27 | 5.27 |
|   | 13 | 8.40 | 28 | 5.17 |
|   | 14 | 7.96 | 29 | 5.08 |
|   | 15 | 7.58 | 30 | 5.00 |

|   |   | MALE GUARANTEED PERIOD | | | FEMALE GUARANTEED PERIOD | | |   | MALE GUARANTEED PERIOD | | | FEMALE GUARANTEED PERIOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|   | AGE | 0 Years | 10 Years | 20 Years | 0 Years | 10 Years | 20 Years | AGE | 0 Years | 10 Years | 20 Years | 0 Years | 10 Years | 20 Years |
|   | 45 | $4.82 | $4.79 | $4.69 | $4.49 | $4.47 | $4.44 | 65 | $6.81 | $6.49 | $5.74 | $5.98 | $5.84 | $5.48 |
|   | 50 | 5.15 | 5.09 | 4.92 | 4.72 | 4.70 | 4.63 | 66 | 6.98 | 6.62 | 5.80 | 6.11 | 5.96 | 5.55 |
| O | 55 | 5.57 | 5.46 | 5.18 | 5.02 | 4.99 | 4.87 | 67 | 7.17 | 6.75 | 5.85 | 6.25 | 6.08 | 5.61 |
| P | 56 | 5.67 | 5.55 | 5.23 | 5.10 | 5.05 | 4.92 | 68 | 7.36 | 6.90 | 5.90 | 6.39 | 6.21 | 5.68 |
| T | 57 | 5.77 | 5.63 | 5.29 | 5.17 | 5.13 | 4.98 | 69 | 7.58 | 7.05 | 5.95 | 6.56 | 6.35 | 5.74 |
| I | 58 | 5.87 | 5.72 | 5.34 | 5.26 | 5.20 | 5.03 | 70 | 7.80 | 7.20 | 5.99 | 6.73 | 6.49 | 5.81 |
| O | 59 | 5.99 | 5.82 | 5.40 | 5.34 | 5.28 | 5.09 | 71 | 8.05 | 7.36 | 6.03 | 6.93 | 6.65 | 5.87 |
| N | 60 | 6.10 | 5.92 | 5.46 | 5.44 | 5.36 | 5.15 | 72 | 8.31 | 7.52 | 6.07 | 7.14 | 6.81 | 5.92 |
|   | 61 | 6.23 | 6.02 | 5.52 | 5.53 | 5.45 | 5.22 | 73 | 8.59 | 7.69 | 6.11 | 7.37 | 6.98 | 5.97 |
| 3 | 62 | 6.36 | 6.13 | 5.57 | 5.63 | 5.54 | 5.28 | 74 | 8.90 | 7.86 | 6.14 | 7.61 | 7.16 | 6.02 |
|   | 63 | 6.50 | 6.24 | 5.63 | 5.74 | 5.64 | 5.35 | 75 | 9.23 | 8.04 | 6.16 | 7.89 | 7.35 | 6.06 |
|   | 64 | 6.65 | 6.36 | 5.69 | 5.86 | 5.74 | 5.41 | 80 | 11.32 | 8.92 | 6.24 | 9.66 | 8.35 | 6.20 |

|   | MALE | FEMALE | | | | | | | | | |
|---|------|--------|----|----|----|----|----|----|----|----|----|
|   |   | 50 | 55 | 60 | 65 | 66 | 67 | 68 | 69 | 70 | 75 |
|   | 50 | $4.75 | $4.90 | $5.07 | $5.27 | $5.31 | $5.35 | $5.39 | $5.44 | $5.49 | $5.75 |
| O | 55 | 4.89 | 5.06 | 5.26 | 5.49 | 5.54 | 5.59 | 5.64 | 5.69 | 5.75 | 6.05 |
| P | 60 | 5.04 | 5.24 | 5.47 | 5.73 | 5.79 | 5.85 | 5.91 | 5.97 | 6.04 | 6.41 |
| T | 65 | 5.21 | 5.43 | 5.70 | 6.01 | 6.08 | 6.15 | 6.22 | 6.30 | 6.38 | 6.82 |
| I | 66 | 5.25 | 5.47 | 5.74 | 6.07 | 6.14 | 6.21 | 6.29 | 6.37 | 6.45 | 6.91 |
| O | 67 | 5.28 | 5.51 | 5.79 | 6.13 | 6.20 | 6.28 | 6.36 | 6.44 | 6.52 | 7.01 |
| N | 68 | 5.32 | 5.56 | 5.85 | 6.19 | 6.26 | 6.34 | 6.43 | 6.51 | 6.60 | 7.11 |
|   | 69 | 5.36 | 5.60 | 5.90 | 6.25 | 6.33 | 6.41 | 6.50 | 6.59 | 6.68 | 7.21 |
| 4 | 70 | 5.40 | 5.65 | 5.95 | 6.32 | 6.40 | 6.48 | 6.57 | 6.66 | 6.76 | 7.31 |
|   | 75 | 5.61 | 5.89 | 6.23 | 6.65 | 6.75 | 6.85 | 6.96 | 7.07 | 7.19 | 7.87 |

Rates for Ages and Sexes Not Shown Will be Given On Request.

## DIVIDEND PROVISIONS

**DIVIDENDS.** As long as this policy is in force, you will receive any dividends declared by us. It is anticipated that no dividends will be declared. The amount of any dividend will be applied to increase the Account Value unless you request it to be paid in cash.

## PREMIUM PROVISIONS

**PREMIUMS.** The Planned Premium is shown on the Data Page. The Owner may change the frequency and amount of the Planned Premium at any time.

The initial Planned Premium is due on the Date of Issue. It must be paid to put the policy in force.

Premium Payments after the first may be paid during the lifetime of the Insured at any time before the Maturity Date. Premiums may be paid for any amount except that:

1. no premium payment may be less than State Life's then published minimum premium amount; and
2. if more than one premium is paid in a calendar month, each additional premium payment must be at least $25.00.

Premiums after the first are to be paid to the Home Office or to an authorized agent. A receipt will be given on request. State Life will send premium reminder notices on written request. The notices may be sent every 3, 6, or 12 months. Notices will not be sent if premiums are paid by Pre-Authorized Check.

**PREMIUM LIMITATION.** Under the Internal Revenue Code of 1954, as amended, there is a limit to the amount of premiums which can be paid under a life insurance contract. State Life will refund, within 60 days after the end of the policy year in which the excess is paid, any monies which exceed the limit.

**GRACE PERIOD.** If the surrender value is not enough on a Monthly Deduction Day to cover the Cost of Insurance, State Life will allow a grace period of 61days to pay a premium that will cover the Cost of Insurance.
The policy will stay in force during the grace period. If the premium is not paid within 61 days after the Monthly Deduction Day, the policy will terminate without value at the end of the grace period, unless the Continuation of Insurance Guarantee applies. Written notice will be sent to the Owner at least 31 days before termination.

**REINSTATEMENT.** The Owner may reinstate the policy after the grace period has expired at any time within 5 years after the date of termination if:

1. the policy has not matured or been surrendered for cash;
2. the Insured provides evidence of insurability satisfactory to State Life;
3. any other person covered by a rider attached to the policy provides evidence of insurability satisfactory to State Life; and
4. a premium great enough to keep the policy in force for 2 months is paid.

## POLICY LOAN PROVISIONS

**CASH LOAN.** The Owner may borrow on this policy. The policy will be the sole security for the loan. The loan, plus any other policy debt, may not exceed the loan value of the policy. State Life will deduct interest to the end of the policy year from the amount of the loan.

State Life may delay making a loan, except for a loan to pay premiums, for the period permitted by law, but not for more than 6 months.

**INTEREST CREDITED.** The interest rate credited on Loans will be at least equal to the rate shown on the Data Page. We may credit a higher rate.

**LOAN INTEREST RATE.** The Loan Interest Rate is shown on the Data Page. Loan interest will be credited daily and is due as it accrues. Any interest not paid when due will be added to the policy debt and bear interest at the same rate. The loan interest rate is determined on each policy anniversary.

State Life will notify the Owner of:
1. the loan interest rate when a loan is made; and
2. any increase in loan interest rate affecting existing policy debt.

This policy will not terminate because interest is due or a loan has not been repaid unless at the end of the policy year:
1. the policy debt exceeds the loan value; and
2. State Life gives notice that the policy will terminate unless some of the policy debt is repaid. The amount needed to keep the policy in force will be given in the notice. The notice will be sent to the last known address of the Owner and any assignee of record. The policy will terminate 31 days after the notice is sent unless the needed amount is paid.

**REPAYMENT.** Some or all of a loan may be repaid at any time before the Insured dies or the policy matures.

## POLICY VALUE PROVISIONS

**ACCOUNT VALUE.** On a Monthly Deduction Day, the Account Value is:
1. the Account Value on the preceding Monthly Deduction Day, with 1 month's interest; plus
2. all net premiums received since the preceding Monthly Deduction Day, with pro rata interest; less
3. the Cost of Insurance for the month following the Monthly Deduction Day; less
4. any monthly administrative charge; less
5. all withdrawals since the preceding Monthly Deduction Day, with pro rata interest.

On any day other than a Monthly Deduction Day, the Account Value is:
1. the Account Value on the preceding Monthly Deduction Day, with pro rata interest; plus
2. all net premiums received since the preceding Monthly Deduction Day, with pro rata interest; less
3. all withdrawals since the preceding Monthly Deduction Day with pro rata interest to the date of calculation.

The Account Value on the Date of Issue is the initial net premium less the Cost of Insurance for the month following the Date of Issue.

**Application for Life Insurance – Part I**
(Please print in dark ink.)

The State Life Insurance Company
P.O. Box 7189
Indianapolis, IN 46207-7189


STATE LIFE
a OneAmerica
financial partner

☐ Check here if application is on multiple lives. If so, complete a separate application or the appropriate supplement for each proposed insured.

✓
### 1. Proposed Insured

| First Name | Middle Initial | Last Name |
|---|---|---|
| DENISE | DIANE | SMITH |

Street Address  8935  FIRESTONE  CIR
DULUTH  GA  30097
City  State  Zip

E-Mail Address: W2b@YAHOO.COM  Day Phone 6-776-4237  Evening Phone 6-417-9695
☐ Married  ☑ Single  Sex  F  Height  5'9"  Weight  250
Date of Birth  3-11-57  Social Security Number (SSN)  256 - 96 - 5737
Place of Birth  ATLANTA, GA  Driver's License No./State
Citizenship  ☑ U.S.  ☐ Canada  ☐ Other  If other, please complete SL-083

✓
### 2. Nicotine Use

a. ☐ Never  ☐ Present  ☑ Former  b. Type of nicotine used  CIGARETS
c. When did you quit using all forms of tobacco or nicotine? (month/year)  EARLY 80's

✓
### 3. Occupation

Title: OWNER  Duties: (ALL)
Name of Employer: SMACKII,LLC / FAMOSE, INC  Business Telephone No. 404-874-5425
Business Address: 8935 FIRESTONE CIR., DULUTH GA 30097

### 4. Owner (if other than proposed insured)

| First Name | Middle Initial | Last Name |
|---|---|---|
|  |  |  |

Owner's relationship to proposed insured: _____
(If trust, give name of trustee and date of trust and send copy of trust.)
Street Address _____

City  State  Zip
E-Mail Address: _____  Owner's Social Security or Tax ID Number ___ - __ - __
Contingent Owner (must complete if Proposed Insured under insuring age 16).
a. Full Name _____  b. Relationship _____

### 5. Plan/Riders

Plan Name:  Freedom UL  Face or Specified Amount  1,000,000
If UL:  ☐ Option A – level  ☐ Option B – increasing
Riders:
☐ Waiver of Premium (for UL, Disability Benefit)  Amount $_____
☐ Guaranteed Insurability Rider (GIR)
☐ ADB  Amount $_____
☐ Child Rider (CR)  Amount $_____  (complete SL-084)
☐ Other Insured Rider (for UL, Other Covered Insured) *(Complete a separate application)*
☐ Payor Rider (UL, WL)  ☐ Added Insured Rider
☐ _____

11/23/2003  17:35  6784179594                                    PAGE  02

Nov.22. 2003  9:45AM                                    No.0344  P. 3

## 6. Beneficiary

Give full name, address, date of birth, SSN/Tax ID number and relationship to proposed insured:

(If multiple beneficiaries are named, proceeds are share and share alike unless otherwise specified.)

Primary: __TRENTON LANE SMITH__ Relationship: __SON__

(If trust, provide a copy.) _____

Full Name of Corporation or Trust: _____

Date of Trust: _____ State of Incorporation: _____

Contingent: _____ Relationship: _____

## 7. Mode of Premium Payment

Send premium notice to: ☐ Proposed Insured   ☐ Owner   ☐ Employer

Select Payment Method: ☐ Single Premium $_____

|  | Annual | Semi-Annual | Quarterly | Monthly |
|---|---|---|---|---|
| Individual Direct Bill | ☐ | ☐ | ☐ | N/A |
| Pre-Authorized Check | ☐ | ☐ | ☐ | ☒ |
| Complete Part V. |  |  |  |  |

## 8. Replacement

Do you have existing life insurance or annuity(ies) with this or any other company? ☐ Yes ☒ No

Will this policy be replacing or changing any existing life insurance or annuity with this or any other
company? ☐ Yes ☐ No

List all life insurance or annuities in force on Proposed Insured:

| a. Company | Policy # | Amount | ADB | Year Issued |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

b. Is an application for life, health insurance or annuity pending with this or any other company or society?

☐ Yes ☐ No

Company Name _____  Amount $_____

## 9. Personal Physician (If none, so state. Must answer in all cases.)

Name and Address: __LESLIE GASKILL  6290 Abbotts Bridge D., LUTH, GA 30097__

Date, reason and results for last doctor visit or consultation. __13/dg, 200 suits 201__

__REG. PHYSICAL__

## 10. Annual Income

Earned __250,000__  Unearned __50,000__  Net worth __3.5 mill__

In the past 7 years, have you filed for bankruptcy? ☐ Yes ☒ No

Bankruptcy type: ☐ Personal  ☐ Business  ☐ Other  Date Discharged? _____

## 11. Family History

|  | Age if still Living | Age at Death | State of Health/Cause of Death | Cancer (all types) | | Heart disease, stroke or circulatory disorder | |
|---|---|---|---|---|---|---|---|
|  |  |  |  | Yes | No | Yes | No |
| Mother | 63 |  | Good | ☐ | ☒ | ☐ | ☒ |
| Father | 70 |  | Good | ☐ | ☒ | ☐ | ☒ |
| Siblings | Sister (46) |  | Good | ☒ | ☐ | ☐ | ☒ |
|  | Sister (35) |  | Good | ☐ | ☐ | ☐ | ☒ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ |
|  |  |  |  | ☐ | ☐ | ☐ | ☐ |

SI-075                                    2                                    [10/01]

11/23/2003  17:35   6784179594                                          PAGE  03

Nov.22. 2003  9:45AM                                         No.0344  P. 4

**12. Has any Person Proposed for Insurance: (Please give details in box below)**

a. Any plans to travel or reside outside the USA or Canada longer than a total of two weeks during the next two years? (If yes, complete the Foreign Travel Supplement, SL-083)   ☐ Yes  ☑ No

b. Been convicted of driving under the influence of drugs or alcohol or had two or more other moving violations, or had a driver's license suspended or revoked in the past 5 years?   ☐ Yes  ☑ No

c. In the past 5 years, flown or intend to fly as a pilot, student pilot or crew member of any air craft? (If yes, complete the Aviation Supplement, SL-086)   ☐ Yes  ☑ No

d. Engaged or plan to engage in any hazardous activity such as any type of racing (e.g. auto, motorboat), any type of climbing (e.g. mountain, rock, ice), or any other miscellaneous avocation or sport (e.g. cave exploring, rodeo)? If yes, complete appropriate supplemental questionnaire.   ☐ Yes  ☑ No

e. Been convicted of a felony in the past 10 years?   ☐ Yes  ☑ No

f. Had any company or society decline to issue, reinstate or renew a policy; offered a rated or modified policy; or postponed or cancelled any insurance on your life?   ☐ Yes  ☑ No

Identify Question Number with Your Response *(If you need additional space, attach a separate page.)*

_____

_____

_____

_____

**13. Home Office Endorsement**

(This section not applicable in West Virginia)

**14. Tax Payer ID Certification**

**Substitute W-9 Certification**

I certify under penalty of perjury that: 1) the number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and 2) I am not subject to backup withholding because: a) I am exempt from backup withholding, or b) I have not been notified by the Internal Revenue Service that I am subject to backup withholding.

☐ Check this box if you have been notified by the IRS that you are currently subject to backup withholding because of under reporting interest or dividends on your tax return.

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

**15. Owner's Certification**

Under Federal Income Tax law, you are subject to certain penalties (up to $50 imposed by the IRS) as well as withholding of tax at a 20% rate if you have not provided us with your correct Social Security or other taxpayer identification number (TIN). The number given must be the owner's TIN.

Under penalties of perjury, I certify that the information provided in the Owner's section of page 1 of this application is correct.

Date _____11-23_____ , 20 03   Signed at _Atlanta, GA_
                                              City and State

Broker _Jeff Thomas_          pending   _Denise Smith_
         Stamp or Print Name                Signature of Owner

Broker _Jeff Thomas_
                          Contract No.   If Corporation, Partnership, or Trust, Print Full Name and Sign by Authorized Officer

_____  ____%____
Secondary broker, If Any   Contract No.   Signature of Proposed Insured (omit if under insuring age 16 or if same as Owner)

_Milnee Atlanta  S0424_
General Agent

## Part III – Authorization to Obtain and Disclose Information

### Authorization

I (We), the proposed insured, authorize any licensed physician, medical practitioner, psychotherapist, hospital, clinic, or other medical or medically related facility, insurance company, the MIB, Inc., or any other organization, institution or person, that has any records, prescription records, or knowledge of the health, treatment, or other insurance coverage of any proposed insured named on this application, to give such information to The State Life Insurance Company (State Life) its reinsurers or affiliates to assess my application. The information that may be disclosed includes records or facts relating to employment, other insurance coverage, past and present physical and mental state of health, drug and/or alcohol use, character, habits, avocations, finances, general reputation, credit or other personal traits. I also authorize this investigation company which is employed by State Life, or the General Agent or Agency through which the broker signing this application places business with State Life, to collect and transmit such record and information, excluding information from the MIB, Inc. I further agree that photographic copy of this authorization will be as valid as the original. I authorize State Life to provide the personal physician named on this application any test result performed for this insurance which, in the company's judgment, should be reviewed by a physician familiar with me. This authorization is valid for two years from the date of this application. I understand that I (or my designated representative) am (is) entitled to receive a copy of this authorization. I further understand, that I may revoke this authorization at anytime prior to the issuance of a policy by submitting a signed request to the The State Life Insurance Company. However, requesting such revocation, may result in denial of insurance coverage or benefits. I also understand, that failure to sign an authorization form, may impair the ability of The State Life Insurance Company to evaluate or process an application or claim and may be basis for denying an application or claim for benefits.

**FRAUD WARNING ( Not applicable to residents of AZ, KS, ND, OR, TX, VA, or WA):** Any person who knowingly presents a false or fraudulent claim for payment of a loss of benefit or knowingly presents false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

### Agreement

I (We), the undersigned proposed insured and applicant (if different, both) represent to the best of my (our) knowledge and belief, that all statements and answers in all parts of this application are complete, true and correctly recorded and agree that:

1. No agent or medical examiner of the company is authorized to accept risks, modify contracts or to waive any of the company's rights or requirements.
2. No information has been furnished to any broker or medical examiner in response to any question in any part of this application which is not recorded in the answers to such questions.
3. The entire contract will consist of this application, the policy issued in response to it and any application amendments or personal health statements signed by the proposed insured or applicant.
4. If an initial premium payment has been made, and a Temporary Insurance Agreement(TIA) bearing the same name and date as this application has been received, no insurance will be effective before policy delivery except as provided in the TIA.
5. If no such initial premium payment has been made at the time of making this application, or if the company approves this application different from that applied for as to plan, amount, age, classification or benefits, no insurance shall take effect until (a) the policy is delivered to and accepted by me and (b) the full first premium is paid and (c) the statements and answers in all parts of this application then remain substantially correct. ALL CHECKS SHOULD BE MADE PAYABLE TO THE STATE LIFE INSURANCE COMPANY.
6. If the answers to any question in any part of this application cease to be accurate prior to the delivery of the policy applied for then the correct answers to such questions will be communicated to The State Life Insurance Company prior to the delivery of the policy and coverage shall not take effect until the home office of The State Life Insurance Company has had an opportunity to reevaluate its offer of coverage based upon the revised answers.
7. Except in West Virginia: Changes to the application relating to plan, amount, age, classification or benefits shall be considered ratified only with the owner's written consent, and any other changes to this application made by the company and noted in Part I "Home Office Endorsement," shall be considered ratified by my acceptance of a life insurance policy containing this application showing such changes.

I (We) acknowledge receiving a disclosure statement concerning (1) insurance information practices, (2) an investigative consumer report, (3) disclosure of medical information, and (4) where applicable, fraud warning. If an initial premium payment was made, I (we) knowledge receiving a Temporary Insurance Agreement and reading it in full.

Signed by the applicant at __Atlanta GA__ this __ day of __11-23-03__

        City        State                                         Month        Year

X _____

Applicant's/Owner's signature (if other than proposed insured)       Proposed primary insured's signature  Denise Smith

X _____

Official capacity (if signed on behalf of a corporation, trust, etc.)      Broker's signature

5

5-079                                                      (11/01)

**SZ State Life**

# MEDICAL APPLICATION – STATEMENTS

The State Life Insurance Company
P.O. Box 406
Indianapolis, Indiana 46206

(USE INK ONLY – NO TYPEWRITER)
TO BE COMPLETED BY MEDICAL EXAMINER - ANSWERS MUST BE IN YOUR HANDWRITING PLEASE.

Proposed Insured **Denise D. Smith**   Birth Date **03-11-1957**
First Name / Middle Initial / Last Name   Month / Day / Year

1. a Name and address of your personal physician: **Dr. Leslie Gaskill 6730 Gibbons Bnd.** Je **Rd. #200**
(If none so state)   **Duluth Ga   Suite 201**
  b. Date and reason last consulted: **10/03 Routine annual P.E.**
  c. What treatment was given or medication prescribed: **had us. filee-ni Rx. Media**   **770-495-9325**

2. Has any applicant ever consulted a physician or been treated for any   YES  NO
of the following.
a. Disorder of eyes, ears, nose or throat? ........................ ☐ ☒
b. Dizziness, fainting, convulsions, headache, speech defect, paralysis
   or stroke, mental or nervous disorder? ...................... ☐ ☒
c. Shortness of breath, persistent hoarseness or cough, blood
   spitting, or other respiratory disorder? ..................... ☐ ☒
d. Chest pain, palpitation, high blood pressure, rheumatic fever, or
   other disorder of the heart or circulatory system? ........... ☐ ☒
e. Jaundice, intestinal bleeding, ulcer, recurrent indigestion, or other
   disorder of the stomach, intestines, liver or gallbladder? ...... ☒ ☐
f. Sugar, albumin, blood or pus in urine, venereal disease; stone or
   other disorder of kidney, bladder, prostate or reproductive organs;
   complications of pregnancy, currently pregnant? ............. ☐ ☒
g. Diabetes, thyroid or other endocrine disorders? ............. ☐ ☒
h. Neuritis, sciatica, rheumatism, arthritis, gout, or other disorder of
   the muscles or bones, including the spine, back or joints;
   deformity, lameness, or amputation? ....................... ☐ ☒
i. Disorder of the skin, lymph glands, cyst, tumor or cancer? ...... ☐ ☒
j. Allergies, anemia or other disorder of the blood or glands? ..... ☐ ☒
k. Acquired immune deficiency syndrome (AIDS), AIDS Related
   Complex (ARC), or "AIDS" related conditions? .............. ☐ ☒
l. Positive test for antibodies to the "AIDS" (Human T-cell
   Lymphotropic, Type III, HTLV-III) virus? .................... ☐ ☒
m Any mental or physical disorder not listed above? ........... ☐ ☒

3. Has any applicant ever:
a. Had military service deferment, rejection or discharge because of a
   mental or physical condition? ............................. ☐ ☒
b. Requested or received a pension, benefits or other payments
   because of injury, illness or disability? ..................... ☐ ☒
c. Been so legally prescribed by a physician frequently, habitually or
   to excess used narcotics (such as heroin, morphines, opiates);
   sedatives or depressants (such as barbiturates, tranquilizers);
   stimulants (such as amphetamines); hallucinogens (such as LSD,
   mescaline, peyote); marijuana; toluene; cocaine? ............ ☐ ☒
d. Sought or received advice for, or treatment of, or been arrested for
   the use of, alcohol, marijuana or drugs? .................... ☐ ☒
e. Used nicotine? .......................................... ☒ ☐
   If yes, in what form? ☐ Pipe ☐ Cigar ☐ Gum ☒ Cigarette
   ☐ Smokeless. If you formerly used nicotine, give date last used: **1-90**

4. Within the past 5 years, has any applicant:
a. Had a checkup, consultation, illness, injury or surgery not
   mentioned above? ....................................... ☒ ☐
b. Been a patient in a hospital, clinic, sanatorium or other facility or
   refused to seek treatment as advised? ..................... ☐ ☒
c. Had EKG, X-ray, blood or urine tests, lab studies or other
   diagnostic tests? ........................................ ☒ ☐

5. Is any applicant currently under a doctor's   YES  NO
   care or taking medication? ..................... ☒ ☐
6. FAMILY HISTORY: Do any of your parents'
   brothers, sisters or children have diabetes;
   cancer; high blood pressure, heart or
   vascular disorder, kidney disorder; mental
   or nervous disorder or other serious
   disorder? .................................... ☒ ☐

| | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|
| Father | 70 | | |
| Mother | 64 | | |
| Brothers No. Living | 2 | 39 | |
| Sisters No. Dead | 5 | 40 | |

DETAILS of "Yes" answers. (IDENTIFY QUESTION
NUMBER, CIRCLE APPLICABLE ITEMS: Include
diagnosis, dates, duration and names and addresses of all
attending physicians and medical facilities.)

**Refill – Lexapro**
**Clonazepam**
**Prevacid**

**5- see above**
**#1**

**6-Father dx = HBP**
**age 50?**

**2e-2002 dx = Acid Reflux**
**Tx = Prevacid     Dr. Gaskill**
**Colonoscopy     NL**
**Upper GI     NL**

**4a-2002 dx = Restless leg Syndrome**
**+ Tx Clonazepam   Dr. Gaskill**

**4a-c – 2002**
**Routine Annual P.E. Pap**
**Dr. Laura   bld**
**Darkins   mammogram   NL**
**6610 McGinnis Fy Rd.**
**#100**
**Rx - HRT – due to menopause**
**Lexapro w/t plasma**

I declare that the statements and answers shown above are true and complete to the best of my knowledge and belief, and I agree that they
shall be considered the basis of any insurance issued.

Dated at **Duluth Ga**   this **11**   day of **Dec., 2003**

_____ M.D.   X _____
(Signature of Medical Examiner)   (Signature of Proposed Insured)

**Elizabeth Ruiz**

IZ-0105A  Rev 12/00 •   Page 1

## AUTHORIZATION AND ACKNOWLEDGEMENT

I authorize any licensed physician, medical practitioner, clinic, hospital, or other medical or medically related facility, employer, consumer
reporting agency, insurance company, the Medical Information Bureau, or other person, organization, or institution, that has any records or
knowledge of me or my child for whom insurance application is made, or me or my child's health, to give to The State Life Insurance Company,
or its reinsurers, any such information and to testify as to such information, all to the extent permitted by law. Such information may include
diagnosis, treatment, and prognosis with respect to any physical or mental condition, employment, other insurance coverage, claims history, and
mode of living. I specifically authorize the parties named above to release information about drug and alcohol use and psychiatric history.

All of the above organizations except the Bureau are also authorized to release such information to The State Life Insurance Company, its
reinsurers, insurance support organizations, or their authorized representatives.

This information will be used for underwriting purposes only. A photocopy of this authorization will be as valid as the original.

This authorization will be valid for thirty months form the date shown below.

I know that I may receive a copy of this authorization. I also know that if a consumer report is prepared about me, I may request a copy of the
report. I have received notices regarding the Fair Credit Reporting Act, the Medical Information Bureau, and State Life's information practices.

Date **12-11-03**   Full Signature of Proposed Insured X _____

## POLICY VALUE PROVISIONS

If the Death Benefit is Option A and coverage has been increased, the Account Value will first be considered a part of the Initial Specified Amount. If the Account Value exceeds the Initial Specified Amount, it will be considered a part of additional Specified Amounts resulting from increases in the order of increases.

**COST OF INSURANCE.** The Cost of Insurance is determined each month. It is the cost for this policy plus the cost for any riders.
The cost for the policy is:

$$\begin{array}{c} \text{Death Benefit on the Monthly Deduction Day} \\ \hline 1.0032737 \\ \text{- Account Value on Monthly Deduction Day} \end{array}$$

X Cost of Insurance Rate

**COST OF INSURANCE RATE.** The monthly cost of insurance rate is based on sex, attained age, and rating class of the person insured. Monthly cost of insurance rates may be changed by State Life from time to time. A change in the cost of insurance rates will apply to all persons of the same attained age, sex, and rating class and whose coverage has been in effect for the same length of time. The cost of insurance rates will not exceed those shown in the Table of Guaranteed Maximum Insurance Rates, adjusted as described on the Data Page for any nonstandard rating classification. These rates are based on the mortality table named on the Table of Guaranteed Maximum Insurance Rates.

**MONTHLY ADMINISTRATIVE CHARGE.** The monthly administrative charge is shown on the Data Page. State Life may change this charge from time to time, but the charge will never be greater than the charge shown.

**INTEREST RATE.** The guaranteed interest rate used in calculating the Account Value is .327% per month, compounded monthly. This is equal to 4% per year, compounded yearly. State Life may use an interest rate in excess of the guaranteed rate.

**CASH VALUE.** The cash value on any date is:
1.  the Account Value; less
2.  any surrender charge.

**SURRENDER CHARGE.** The surrender charges for this policy are shown in the Table of Surrender Charges. Additional surrender charges will apply if the Specified Amount is increased. State Life will send a new Table of Surrender Charges to the Owner. Surrender charges will not be decreased if the Specified Amount is decreased.

**SURRENDER.** The Owner may surrender this policy for its surrender value by sending the policy and a written request for surrender to State Life. The surrender value will be determined as of the date State Life receives the written request. All insurance will terminate as of that date. The surrender value within 30 days after a policy anniversary will be at least the value on that anniversary. Any dividend credits withdrawn or policy loans or partial withdrawals made since that date will be deducted. State Life may delay payment of the surrender value for the period permitted by law, but not for more than 6 months.

**PARTIAL WITHDRAWAL.** The Owner may make partial withdrawals by sending a written request to State Life. The amount withdrawn may not exceed the surrender value. State Life will assess a $25 withdrawal fee on each partial withdrawal. The Account Value will be reduced by the amount of the partial withdrawal (including the withdrawal fee). If the Death Benefit is Option A, the Specified Amount also will be reduced by the amount of the withdrawal. State Life will not allow a withdrawal if the resulting Specified Amount would be less than the Minimum Specified Amount.

State Life may delay payment of a partial withdrawal, except for a withdrawal to pay premiums, for the period permitted by law, but not for more than 6 months.

**CONTINUATION OF COVERAGE.** Coverage under this policy and any benefits provided by rider will continue until the surrender value is not great enough to pay the Cost of Insurance. In no event will this provision continue coverage past the Maturity Date, nor will it continue any rider past the termination date stated in the rider.

**BASIS OF COMPUTATIONS.** Guaranteed values and reserves are at least equal to those required by law. A detailed statement of the method of computation of values and reserves has been filed with the insurance department of the state in which this policy is delivered.

Guaranteed values are based on the mortality table shown in the Table of Guaranteed Maximum Insurance Rates at 4% interest.

# *ADJUSTABLE LIFE INSURANCE POLICY*

**Death Benefit Payable Prior to Maturity. Surrender Value Payable at Maturity.**
**Adjustable Death Benefit. Flexible Premiums Payable Until Maturity or Prior Death. Participating.**



**AMERICAN UNITED LIFE INSURANCE COMPANY®**
**CNL FINANCIAL CORPORATION**
**PIONEER MUTUAL LIFE INSURANCE COMPANY***
**THE STATE LIFE INSURANCE COMPANY**

# Our Privacy Commitment *to* You

*OneAmerica Financial Partners and our affiliated companies recognize that the cornerstone of our success is the trust and confidence of our customers. To provide you with the most effective and convenient access to our broad range of products and services, OneAmerica and our affiliates must maintain information about you.* **Because keeping your information secure and private has always been one of our top priorities, you are not required to take any action with us to further protect your privacy.**

*This notice lets you know how we collect information about you, the type of information we collect and what we may disclose to our affiliates and nonaffiliated third parties. It also details the steps we take to protect nonpublic personal information.*

## Collection of Information

We must collect a certain amount of information to provide customer service, offer new products or services, evaluate benefits and claims, administer our products, and fulfill legal and regulatory requirements. Specific language and examples may not apply to all customers, and the information we collect varies accordingly. Examples include:

❖ information on your application and related forms, such as name, address, date of birth, Social Security number, gender, marital status, assets, income, investment option elections and driving history;

❖ information about your relationship with us, such as products or services purchased, account balances, payment history and claims history;

❖ information provided by your employer, benefits plan sponsor or association regarding any group product you may have, such as name, address, Social Security number, age, income and marital status;

❖ information from a consumer reporting agency, such as consumer's creditworthiness and credit history;

❖ information from other sources, such as motor vehicle reports, medical information and demographic information; and

❖ information from visitors to our Web sites, such as that provided through online forms, site visit data and online information-collecting devices known as "cookies." Cookies enable the site to "remember" who you are so you can navigate the site easier. They also permit you to access secured information and conduct secured transactions. We do not record personal or sensitive information in our cookies.

## Sharing and Use of Information

While acknowledging the importance of protecting customer information, we may find it necessary in the course of conducting business to disclose information we collect about you as permitted by law. This would occur in some or all of the following circumstances:

❖ Information may be shared with our affiliates to enable them to provide customer service or account maintenance.

❖ Information may be shared with nonaffiliated third parties (as permitted by law) who are assisting us by performing services or functions on our behalf, such as agents, brokers, brokerage firms, insurance companies, administrators and service providers.

❖ Information may be shared with other financial service companies, such as banks, insurance companies and securities brokers or dealers, with whom we have written joint marketing agreements.

❖ Information may be shared with nonaffiliated third parties as permitted or required by law, such as compliance with a subpoena, fraud prevention or compliance with an inquiry from a government agency or regulator.

❖ Personal health information will be shared only with proper written authorization or as required by law. We will not share medical information or motor vehicle reports for marketing purposes.

❖ Information may be shared with our affiliates so they may tell you about other products or services offered that might be useful or beneficial to you.

*Please see the back of this sheet for more information.*

10-13156C Rev. 1/2003                    *A stock subsidiary of American United Mutual Insurance Holding Company.*

## Protecting the Information

We are committed to upholding our pledge to maintain the security of our customers' personal information. To ensure such information is used only in the manner we have described in this policy, we have instituted the following safeguards:

- ❖ Employees are required to comply with our established privacy policies and procedures, which exist to protect the confidentiality of customer information. Any employee who violates our privacy policies will be subject to a disciplinary process.

- ❖ Employees access the information only on a business need-to-know basis, such as to pay benefits or claims, underwrite a policy, administer a plan or service a customer request.

- ❖ We use manual and electronic security procedures to maintain the confidentiality of the information we collect and to guard against its unauthorized access. Such methods include locked files, user authentication, encryption and firewall technology.

## Consumer Reporting Information

If required by law and upon written request, we will inform you whether a consumer report was requested, as well as the name and address of the consumer reporting agency that furnished the report.

We may share credit reporting information about you with our affiliates. Under the Fair Credit Reporting Act, you may direct us not to share certain credit information with our affiliates, including some nonpublic personal information you provide in your application or that we obtain from nonaffiliated third parties, such as credit bureaus. If you don't want such credit information shared, you may write to us at the address below. Please provide your name, address, Social Security number and account number(s). Your request not to share credit information does not include information we are permitted by law to share with our affiliates, such as information related solely to our experiences or transactions with you, including account balance and payment history.

## Review and Access to Your Information

If required by law and upon written request, we will make information from your file available for your review. We are unable to provide information collected in connection with, or in anticipation of, any claim or lawsuit or any medical information we have obtained from a health care provider.

If you notify OneAmerica that any information is incorrect, we will review it. If we agree, we will correct our records. If we do not agree, you may submit a short statement of dispute, which will be included in any future disclosure of information.

If you have any questions about the right of access or wish access to your file (as permitted by law), please contact us at the address below and include a copy of your personal identification, such as a driver's license or photo identification.

**Privacy Official**
American United Life Insurance Company®
P.O. Box 368
Indianapolis, IN 46206-0368

## Our Continuing Commitment

We will continue to provide this notice at the frequency required by law and will notify customers of any modification at least annually.

We will continue to follow the policies set forth in this notice even when a customer relationship no longer exists. However, that party will no longer be entitled to an annual notice.

*This notice is being provided on behalf of the following OneAmerica affiliates:*

American United Mutual Insurance Holding Company

OneAmerica Financial Partners, Inc.

The State Life Insurance Company

American United Life Re S.A.

AUL Reinsurance Management Services, LLC

AUL Reinsurance Management Services (Bermuda) Ltd.

AUL Reinsurance Management Services Canada Ltd.

CNL Financial Corporation

Cherokee National Life Insurance Company

CNL/Insurance America, Inc.

CNL/Resource Marketing Corp.

CNL Technology Group, Inc.

Commodore National Reinsurance Company, Ltd.

OneAmerica Securities, Inc.

Pioneer Mutual Life Insurance Company*

Our privacy commitment to you also extends to those companies with which we affiliate during the next 12 months.

*\* A stock subsidiary of American United Mutual Insurance Holding Company.*



STATE LIFE
a ONEAMERICA*
financial partner

Dear Policyowner:

Thank you for purchasing life insurance coverage from State Life Insurance Company[a].   In
an effort to serve you better, we will be making an important change to your policy.

The State Life policy you are receiving today bears the date we printed it here at the home
office. However, the date your life insurance coverage begins is the day your agent receives
your premium payment and you sign the proxy-delivery receipt. In order to make the policy
date coincide with the delivery date, the home office will send you an endorsement indicating
the day your coverage became effective. Please keep this endorsement with your policy for
future reference.

If you have any questions about your policy, please call your agent our Customer Care Center
at 1-800-428-2316.

Sincerely,

S. Joseph Pearson, FSA MAAA
Vice President Individual Administration

The State Life
Insurance Company
P.O. Box 406
Indianapolis, IN 46266-0406
(317) 285-2300
Fax: (317) 285-2350

## MATURITY DATE EXTENSION RIDER

The policy to which this rider is attached will continue in force after the scheduled Maturity Date subject to the conditions stated in this rider.

**Conditions**

(a) The policy and this rider must be in force on the scheduled Maturity Date.
(b) The Owner including any assignee must agree in Writing to this continuation.

If any of the above conditions are not met, the policy, if still in force, will terminate on the scheduled Maturity Date.

After the scheduled Maturity Date:

1. The Death Benefit will be reduced to the Account Value;
2. The Account Value, if any, will continue to be valued as described in the policy;
3. Any policy loans in effect on the Maturity Date will continue to accrue interest and become part of any indebtedness;
4. We will take no future monthly deductions;
5. We will not accept any new future premium payments.

**General Provisions** - This rider is part of the policy to which it is attached. Except where this rider provides otherwise, it is subject to all conditions and limitations of such policy.

The Date of Issue of this rider is the same as that of the policy unless a different date is shown on Page 3 of the policy. The Rider Date is the same as the Policy Date unless a different date is shown on Page 3 of the policy.

**Termination** - To terminate this rider, notify Us in writing. Otherwise, it will continue until the earliest of the following:

(a) the end of the grace period for the policy; or
(b) the date the policy terminates.

Unless requested, all other riders attached to the policy will deem to have terminated at the scheduled Maturity Date.

Secretary

R480                                                                                                    10-98

**THE STATE LIFE INSURANCE COMPANY**
**ONE AMERICAN SQUARE**
**INDIANAPOLIS, INDIANA 46282**
(317)-285-2300

---

A Life Insurance Basic Policy Illustration

---

Flexible Premium Adjustable Life
LifeStyle Freedom UL
Policy Form # L260

Prepared for:
DENISE D. SMITH

Prepared by:
JEFFREY THOMAS
1 Main St
Indianapolis, Indiana 46208

Date: January  23, 2004

*Fritz Milner*
*770- 452-8869*

This is page 1 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
Life Insurance Basic Policy Illustration
LifeStyle Freedom UL

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000  Option: A | Table Rating: | None |
| Monthly S-O-M Premium:$1,082.36 | | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

## POLICY ILLUSTRATION EXPLANATION

**About This Policy** - The Universal Life policy which you are considering, also known as Flexible Premium Adjustable Life Insurance, is a life insurance policy providing for a flexible death benefit and flexible premium payments. These flexible premiums are payable to age 100. The values in the life insurance contract change based on the amount of your premium payments, monthly deductions, loans and/or withdrawals, and the interest rate credited to the policy. This rate is subject to change at any time, but is guaranteed never to be below a 4% minimum. Additional non-guaranteed elements of this policy are described on the following pages.

**Underwriting Class**- The premium outlay for this coverage has been calculated assuming this policy is issued in the Standard No Tobacco underwriting class. Actual premiums for the insurance coverage will ultimately depend on the outcome of the underwriting process, and may vary from what is shown on this illustration. If so, you will receive a revised illustration with your insurance policy.

**Initial Death Benefit** - The death benefit provided at issue is assumed to be $1,000,000. The death benefit is the amount payable in the event of death, as stated on the Policy Data Page (page 3 of the policy). The actual amount payable may be decreased by policy loans and policy partial withdrawals or increased by additional insurance benefits.

**Death Benefit Option** - This illustration is based on a Level Death Benefit Option (Option A). The death benefit is equal to the greater of the policy's specified amount on the date of death or the applicable percentage of the account value on the date of death. The applicable percentages are shown in the policy.

**Guaranteed Elements of This Policy** - Provided a premium of at least $12,988.32 is paid each year by the premium due date until age 100 and no partial withdrawals or loans are made, the Initial Death Benefit of $1,000,000 is guaranteed to remain in force until age 100.

**Non-Guaranteed Elements of this Policy** - The interest rate actually credited may exceed the guaranteed interest rate of 4%. The monthly cost of insurance rates may be less than the maximum guaranteed cost of insurance rates. These non-guaranteed elements can increase the value of your life insurance policy in one of two ways: by increasing your policy's cash value and/or death benefit; or by reducing the out-of-pocket cost of your policy.

The non-guaranteed pages provide snapshots of your policy assuming higher interest and lower expenses than those that are guaranteed. Since interest and expenses cannot be predicted with absolute certainty, ranges of results have been illustrated. The actual policy values will be less or more favorable than these illustrated ranges of results.

**Planned Premium** - If your annual premium outlay shown in the Policy Illustration Summary and Policy Illustration Tabular Detail is paid in the years shown assuming guaranteed interest rate and guaranteed charges, the insurance coverage shown in the Policy Illustration Numeric Summary and Policy Illustration Tabular Detail would remain in force to age 100.

Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.
This is page 2 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
### Life Insurance Basic Policy Illustration
### LifeStyle Freedom UL

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000  Option: A | Table Rating: | None |
| Monthly S-O-M Premium: | $1,082.36 | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

## POLICY ILLUSTRATION EXPLANATION (Continued)

**Monthly Insurance Charge-** 95% of premium payments paid to the policy are credited to the policy account value. The account value is credited monthly with interest at a rate guaranteed to be no less than 4% on an annualized basis. The cost of insurance, together with an expense charge is deducted monthly from the account value. The cost of insurance is calculated using the 1980 Commissioner's Standard Ordinary Smoker and Sex Distinct Mortality table or the company's current rate, if lower.

### RIDERS SELECTED (See Supplemental Illustration which follows for details)

This illustration includes the Guaranteed Coverage to Age 100 Rider.

The Guaranteed to Age 100 Rider when elected, and assuming the required to age 100 premiums are paid less any partial surrenders or loans, the company guarantees to keep coverage in force to the insured's age 100, regardless of the balance of the policy's underlying account value.

The Accelerated Benefit Rider (ABR) provides for advancing a portion of the policy's death benefit if the insured is diagnosed with a terminal illness. The ABR is automatically included as part of every permanent State Life policy ($10,000 or more) at no additional cost. The minimum amount of the accelerated benefit is $5,000. The maximum amount available is the lesser of $500,000 or half the eligible death benefit. ABR may or may not be approved in your state. Please see your policy contract for complete details.

The Maturity Date Extension Rider (MDER) is provided automatically with all permanent plans. The policyholder must agree to accept it on the policy delivery receipt. The MDER provides that after the scheduled maturity date:
1. The death benefit will be reduced to the account value.
2. The account value, if any, will continue to be valued as described in the policy.
3. Any policy loans in effect on the maturity date will continue to accrue interest and become part of any indebtedness.
4. The company will take not future monthly deductions.
5. The company will not accept any future premium payments.

### COLUMN HEADING DEFINITIONS

**Year -** The number of years since the assumed policy issue date.

**Age -** The attained age of the proposed insured at the end of the policy year.

**Premium Outlay -** The annualized payment schedule anticipated for this policy.

**Non-Guaranteed Current Cash Value -** The illustrated cash value of the policy is calculated using the anticipated premium outlay, the current interest crediting rate (which is not guaranteed) and current monthly insurance charges (which are not guaranteed).

Prepared by JEFFREY THOMAS on January  23, 2004 for delivery in the state of Georgia.
This is page 3 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
### Life Insurance Basic Policy Illustration
### LifeStyle Freedom UL

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000  Option: A | Table Rating: | None |
| Monthly S-O-M Premium:$1,082.36 | | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

## COLUMN HEADING DEFINITIONS (Continued)

Non-Guaranteed Current Death Benefit - The death benefit payable at the end of a policy year is calculated using the anticipated premium outlay, the current interest crediting rate (which is not guaranteed) and current monthly insurance charges (which are not guaranteed).

Non-Guaranteed Mid-Point Cash Value - The illustrated cash value of the policy is calculated using the anticipated premium outlay, an interest rate midway between the guaranteed interest rate and the current interest rate (which is not guaranteed), and using an average of current and guaranteed monthly insurance charges (which is not guaranteed).

Non-Guaranteed Mid-Point Death Benefit - The illustrated death benefit payable at the end of a policy year is calculated using the anticipated premium outlay, an interest rate midway between the guaranteed interest rate and the current interest rate (which is not guaranteed), and using an average of current and guaranteed monthly insurance charges (which are not guaranteed).

Guaranteed Cash Value - The guaranteed cash value is calculated using the anticipated premium outlay, guaranteed interest crediting rate and the guaranteed maximum insurance charges.

Guaranteed Death Benefit - The guaranteed death benefit payable at death of the insured is calculated using the anticipated premium outlay, guaranteed interest crediting rate and the guaranteed maximum insurance charges.

## KEY WORD DEFINITIONS

Illustration- A depiction of guaranteed and non-guaranteed policy values and death benefits over a period of years based upon specified gender, risk classification, smoking status, premium outlay and death benefit.

5% Net Surrender Cost Index- This index is useful to compare costs if at some future point in time, such as the 10th or 20th policy year, the policy is surrendered for its cash value. This index is important if the main concern is the level of the policy cash value.

5% Net Payment Cost Index- This index is useful to compare costs if at some future point in time, such as the 10th or 20th policy year, if premium payments continue as illustrated and the policy is not surrendered. This index is important if the main concern is the benefit to be paid at your death.

Monthly Insurance Charge- The charge deducted from the policy's account value each month to cover the insurance company's risk of the insured's death.

Evidence of Insurability- Proof of a person's good health and other related factors required by the insurance company as part of the underwriting and rating requirements.

Underwriting Classification - Standard: A person having characteristics that suggest an average life expectancy for an insured risk and therefore qualifying for standard premium rates.

Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.
This is page 4 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
Life Insurance Basic Policy Illustration
LifeStyle Freedom UL

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000   Option: A | Table Rating: | None |
| Monthly S-O-M Premium:$1,082.36 | | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

## KEY WORD DEFINITIONS (Continued)

**Tobacco Status - No Tobacco:** A person who has not smoked cigarettes within the past 12 months and who has not been found to have nicotine in the urine in the past 12 months.

## TAXATION OF LIFE INSURANCE

In order to receive favorable tax treatment of distributions (including loans) under the Internal Revenue Code, a life insurance policy must satisfy a 7-pay premium limitation during the first 7 policy years and subsequent 7 year periods after certain policy changes. Failure to satisfy this limitation would classify this policy as a Modified Endowment Contract (MEC) and cause distributions to be taxable to the extent there is gain in the contract. In addition, there is a penalty of 10% of taxable income for distributions from such policies prior to the policy owner's age 59 1/2, with certain exceptions. In any case, a gain in the contract is taxable upon full surrender of the policy.

Initial 7-pay Premium:  $ 51,143.96

This policy, as illustrated, is NOT a Modified Endowment contract; however, certain changes to the policy's benefits (whether illustrated or not) will alter the 7-pay premium limitations and could cause the policy to later become a Modified Endowment contract and lose its favorable tax treatment. IRC interpretation is subject to change. State Life does not provide tax advice. Please consult your personal tax advisor.

Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.
This is page 5 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
### Life Insurance Basic Policy Illustration - Numeric Summary
### LifeStyle Freedom UL

| | | |
|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: No Tobacco |
| Initial Death Benefit: | $1,000,000  Option: A | Table Rating: None |
| Monthly S-O-M Premium:$1,082.36 | | Flat Extra: $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: $0.00 |

| End of Year | Annualized Premium Outlay | Guaranteed 4.0% Interest Rate and Maximum Charges | | Non-Guaranteed Mid-Point | | Non-Guaranteed Current 6.200% Interest Rate and Current Charges | |
|---|---|---|---|---|---|---|---|
| | | Cash Value | Death Benefit | Cash Value | Death Benefit | Cash Value | Death Benefit |
| 5 | 12,988.32 | 21,458 | 1,000,000 | 29,272 | 1,000,000 | 37,081 | 1,000,000 |
| 10 | 12,988.32 | 67,181 | 1,000,000 | 91,480 | 1,000,000 | 116,874 | 1,000,000 |
| 20 | 12,988.32 | 136,033 | 1,000,000 | 228,746 | 1,000,000 | 333,059 | 1,000,000 |
| Age 70 | 12,988.32 | 138,271 | 1,000,000 | 270,749 | 1,000,000 | 421,012 | 1,000,000 |

GUARANTEED: Based on the planned premium outlay, assuming the guaranteed interest rate of 4% and guaranteed insurance charges, insurance coverage will remain in force to age 100.

NON-GUARANTEED: This illustration assumes that the non-guaranteed elements currently illustrated will continue unchanged for all years shown. This is not likely to occur and actual results may be more or less favorable.

Current Interest Rate is 6.200%
Mid-Point Interest Rate is 5.100%

Current values are based on current insurance charges and midpoint values are based on the average of current and guaranteed insurance charges. Based on the premium outlay, insurance coverage would remain in force to age 100 based on current assumptions and to age 100 based on midpoint values.

I have received all pages of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be either higher or lower. The agent has told me they are not guaranteed.

Applicant: _____ Date: _____

I certify that all pages of this illustration have been presented to the applicant and that I have explained that any non-guaranteed elements are subject to change. I made no representations that are inconsistent with the illustration.

Agent: _____ Date: _____

| | 5% Interest Adjusted Cost Indexes | | | |
|---|---|---|---|---|
| | Surrender Cost Index | | Net Payment Cost Index | |
| | 10th Year | 20th Year | 10th Year | 20th Year |
| Guaranteed Values | 7.90 | 9.07 | 12.99 | 12.99 |
| Current Values | 4.14 | 3.40 | 12.99 | 12.99 |

Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.
This is page 6 of 7 and is not valid unless all pages are included.

Version 1.14.0

# THE STATE LIFE INSURANCE COMPANY
## Life Insurance Basic Policy Illustration - Tabular Detail
### LifeStyle Freedom UL

Prepared for:      DENISE D. SMITH      Underwriting Class:      Standard
Sex: Female      Age: 47 (DOB: 03/11/1957)      Tobacco Status:      No Tobacco
Initial Death Benefit:    $1,000,000  Option: A      Table Rating:      None
Monthly S-O-M Premium: $1,082.36      Flat Extra:      $0.00/0 years
Years Premium Paid:    53      Add'l 1st Yr Premium:      $0.00

| End of Year | Age | Annualized Premium Outlay | Guaranteed 4.0% Interest Rate and Maximum Charges | | | Non-Guaranteed Current 6.200% Interest Rate and Current Charges | | |
|---|---|---|---|---|---|---|---|---|
| | | | Account Value | Cash Value | Death Benefit | Account Value | Cash Value | Death Benefit |
| 1 | 48 | 12,988.32 | 7,331 | 0 | 1,000,000 | 9,577 | 0 | 1,000,000 |
| 2 | 49 | 12,988.32 | 14,718 | 0 | 1,000,000 | 19,609 | 4,009 | 1,000,000 |
| 3 | 50 | 12,988.32 | 22,156 | 6,556 | 1,000,000 | 30,149 | 14,549 | 1,000,000 |
| 4 | 51 | 12,988.32 | 29,608 | 14,008 | 1,000,000 | 41,158 | 25,558 | 1,000,000 |
| 5 | 52 | 12,988.32 | 37,058 | 21,458 | 1,000,000 | 52,681 | 37,081 | 1,000,000 |
| 6 | 53 | 12,988.32 | 44,836 | 30,796 | 1,000,000 | 65,843 | 51,803 | 1,000,000 |
| 7 | 54 | 12,988.32 | 52,532 | 40,052 | 1,000,000 | 79,583 | 67,103 | 1,000,000 |
| 8 | 55 | 12,988.32 | 60,136 | 49,216 | 1,000,000 | 93,928 | 83,008 | 1,000,000 |
| 9 | 56 | 12,988.32 | 67,622 | 58,262 | 1,000,000 | 108,954 | 99,594 | 1,000,000 |
| 10 | 57 | 12,988.32 | 74,981 | 67,181 | 1,000,000 | 124,674 | 116,874 | 1,000,000 |
| 15 | 62 | 12,988.32 | 109,593 | 109,593 | 1,000,000 | 214,978 | 214,978 | 1,000,000 |
| 20 | 67 | 12,988.32 | 136,033 | 136,033 | 1,000,000 | 333,059 | 333,059 | 1,000,000 |
| 25 | 72 | 12,988.32 | 131,141 | 131,141 | 1,000,000 | 488,103 | 488,103 | 1,000,000 |
| 30 | 77 | 12,988.32 | 45,554 | 45,554 | 1,000,000 | 693,362 | 693,362 | 1,000,000 |
| 35 | 82 | 12,988.32 | 0 | 0 | 1,000,000 | 981,267 | 981,267 | 1,030,330 |
| 40 | 87 | 12,988.32 | 0 | 0 | 1,000,000 | 1,381,661 | 1,381,661 | 1,450,744 |
| 45 | 92 | 12,988.32 | 0 | 0 | 1,000,000 | 1,905,023 | 1,905,023 | 1,981,224 |
| 50 | 97 | 12,988.32 | 0 | 0 | 1,000,000 | 2,631,250 | 2,631,250 | 2,631,250 |
| 53 | 100 | 12,988.32 | 0 | 0 | 1,000,000 | 3,192,058 | 3,192,058 | 3,192,058 |

GUARANTEED: Based on the planned premium outlay, assuming the guaranteed interest rate of 4% and guaranteed insurance charges, insurance coverage will remain in force to age 100.

Current Interest Rate is 6.200%

Current values are based on current insurance charges. Based on the premium outlay, insurance coverage would remain in force to age 100.

This illustration is not a policy contract.

Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.
This is page 7 of 7 and is not valid unless all pages are included.      Version 1.14.0

1.14.0

# THE STATE LIFE INSURANCE COMPANY

Page 1 of 2

ONE AMERICAN SQUARE
INDIANAPOLIS, INDIANA 46282
(317) 285-2300

**Supplemental Illustration**
**LifeStyle Freedom UL**

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000 Option: A | Table Rating: | None |
| Monthly S-O-M Premium | $1,082.36 | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

| | | Guaranteed - 4.0% | | | Non-Guaranteed Current - 6.200% | | |
|---|---|---|---|---|---|---|---|
| Year | Age | Annualized Premium | Account Value | Cash Value | Death Benefit | Account Value | Cash Value | Death Benefit |
| 1 | 48 | 12,988.32 | 7,331 | 0 | 1,000,000 | 9,577 | 0 | 1,000,000 |
| 2 | 49 | 12,988.32 | 14,718 | 0 | 1,000,000 | 19,609 | 4,009 | 1,000,000 |
| 3 | 50 | 12,988.32 | 22,156 | 6,556 | 1,000,000 | 30,149 | 14,549 | 1,000,000 |
| 4 | 51 | 12,988.32 | 29,608 | 14,008 | 1,000,000 | 41,158 | 25,558 | 1,000,000 |
| 5 | 52 | 12,988.32 | 37,058 | 21,458 | 1,000,000 | 52,681 | 37,081 | 1,000,000 |
| | | 64,941.60 | | | | | | |
| 6 | 53 | 12,988.32 | 44,836 | 30,796 | 1,000,000 | 65,843 | 51,803 | 1,000,000 |
| 7 | 54 | 12,988.32 | 52,532 | 40,052 | 1,000,000 | 79,583 | 67,103 | 1,000,000 |
| 8 | 55 | 12,988.32 | 60,136 | 49,216 | 1,000,000 | 93,928 | 83,008 | 1,000,000 |
| 9 | 56 | 12,988.32 | 67,622 | 58,262 | 1,000,000 | 108,954 | 99,594 | 1,000,000 |
| 10 | 57 | 12,988.32 | 74,981 | 67,181 | 1,000,000 | 124,674 | 116,874 | 1,000,000 |
| | | 129,883.20 | | | | | | |
| 11 | 58 | 12,988.32 | 82,214 | 75,974 | 1,000,000 | 141,115 | 134,875 | 1,000,000 |
| 12 | 59 | 12,988.32 | 89,343 | 84,663 | 1,000,000 | 158,353 | 153,673 | 1,000,000 |
| 13 | 60 | 12,988.32 | 96,339 | 93,219 | 1,000,000 | 176,444 | 173,324 | 1,000,000 |
| 14 | 61 | 12,988.32 | 103,123 | 101,563 | 1,000,000 | 195,245 | 193,685 | 1,000,000 |
| 15 | 62 | 12,988.32 | 109,593 | 109,593 | 1,000,000 | 214,978 | 214,978 | 1,000,000 |
| | | 194,824.80 | | | | | | |
| 16 | 63 | 12,988.32 | 116,557 | 116,557 | 1,000,000 | 236,294 | 236,294 | 1,000,000 |
| 17 | 64 | 12,988.32 | 122,860 | 122,860 | 1,000,000 | 258,691 | 258,691 | 1,000,000 |
| 18 | 65 | 12,988.32 | 128,295 | 128,295 | 1,000,000 | 282,238 | 282,238 | 1,000,000 |
| 19 | 66 | 12,988.32 | 132,733 | 132,733 | 1,000,000 | 307,003 | 307,003 | 1,000,000 |
| 20 | 67 | 12,988.32 | 136,033 | 136,033 | 1,000,000 | 333,059 | 333,059 | 1,000,000 |
| | | 259,766.40 | | | | | | |
| 25 | 72 | 12,988.32 | 131,141 | 131,141 | 1,000,000 | 488,103 | 488,103 | 1,000,000 |
| 30 | 77 | 12,988.32 | 45,554 | 45,554 | 1,000,000 | 693,362 | 693,362 | 1,000,000 |
| 35 | 82 | 12,988.32 | 0 | 0 | 1,000,000 | 981,267 | 981,267 | 1,030,330 |
| 40 | 87 | 12,988.32 | 0 | 0 | 1,000,000 | 1,381,661 | 1,381,661 | 1,450,744 |
| 45 | 92 | 12,988.32 | 0 | 0 | 1,000,000 | 1,905,023 | 1,905,023 | 1,981,224 |
| | | 584,474.40 | | | | | | |

Current rate 6.20% all years.

Non-Guaranteed: This illustration assumes that the non-guaranteed elements currently illustrated will continue unchanged for all years shown. This is not likely to occur and actual results may be more or less favorable and are not guaranteed. THIS SUPPLEMENTAL ILLUSTRATION IS NOT VALID UNLESS ACCOMPANIED BY THE LIFE INSURANCE BASIC POLICY ILLUSTRATION. THIS ILLUSTRATION IS NOT A POLICY CONTRACT
Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.

V1.14.0        **THE STATE LIFE INSURANCE COMPANY**       Page 2 of 2

ONE AMERICAN SQUARE
INDIANAPOLIS, INDIANA 46282
(317)-285-2300

**Supplemental Illustration**
**LifeStyle Freedom UL**

| | | | |
|---|---|---|---|
| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000 Option: A | Table Rating: | None |
| Monthly S-O-M Premium | $1,082.36 | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

| | | Guaranteed - 4.0% | | | Non-Guaranteed Current - 6.200% | | |
|---|---|---|---|---|---|---|---|
| Year Age | Annualized Premium | Account Value | Cash Value | Death Benefit | Account Value | Cash Value | Death Benefit |
| 50  97 | 12,988.32 | 0 | 0 | 1,000,000 | 2,631,250 | 2,631,250 | 2,631,250 |
| 53  100 | 12,988.32 | 0 | 0 | 1,000,000 | 3,192,058 | 3,192,058 | 3,192,058 |
| | 688,380.96 | | | | | | |

Current rate 6.20% all years.

Non-Guaranteed: This illustration assumes that the non-guaranteed elements currently illustrated will continue unchanged for all years shown. This is not likely to occur and actual results may be more or less favorable and are not guaranteed. THIS SUPPLEMENTAL ILLUSTRATION IS NOT VALID UNLESS ACCOMPANIED BY THE LIFE INSURANCE BASIC POLICY ILLUSTRATION. THIS ILLUSTRATION IS NOT A POLICY CONTRACT
Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.

\ 1.14.0       **THE STATE LIFE INSURANCE COMPANY**       Page 1 of 1

ONE AMERICAN SQUARE
INDIANAPOLIS, INDIANA 46282
(317)-285-2300

**Supplemental Summary Illustration**
**LifeStyle Freedom UL**

| Prepared for: | DENISE D. SMITH | Underwriting Class: | Standard |
|---|---|---|---|
| Sex: Female | Age: 47 (DOB: 03/11/1957) | Tobacco Status: | No Tobacco |
| Initial Death Benefit: | $1,000,000  Option: A | Table Rating: | None |
| Monthly S-O-M Premium:$1,082.36 | | Flat Extra: | $0.00/0 years |
| Years Premium Paid: | 53 | Add'l 1st Yr Premium: | $0.00 |

| | | | Guaranteed - 4.0% | | | Non-Guaranteed Current - 6.200% | |
|---|---|---|---|---|---|---|---|
| Year Age | Total Premium | Account Value | Cash Value | Death Benefit | Account Value | Cash Value | Death Benefit |
| 1 | 48 | 12,988.32 | 7,331 | 0 | 1,000,000 | 9,577 | 0 | 1,000,000 |
| 10 | 57 | 129,883.20 | 74,981 | 67,181 | 1,000,000 | 124,674 | 116,874 | 1,000,000 |
| 13 | 60 | 168,848.16 | 96,339 | 93,219 | 1,000,000 | 176,444 | 173,324 | 1,000,000 |
| 18 | 65 | 233,789.76 | 128,295 | 128,295 | 1,000,000 | 282,238 | 282,238 | 1,000,000 |
| 20 | 67 | 259,766.40 | 136,033 | 136,033 | 1,000,000 | 333,059 | 333,059 | 1,000,000 |
| 23 | 70 | 298,731.36 | 138,271 | 138,271 | 1,000,000 | 421,012 | 421,012 | 1,000,000 |
| 53 | 100 | 688,380.96 | 0 | 0 | 1,000,000 | 3,192,058 | 3,192,058 | 3,192,058 |

| Rider(s) | Amount |
|---|---|
| Guarantee to Age 100 Rider | Included |
| Accelerated Benefit Rider | No Cost |
| Extended Maturity Rider | No Cost |

State Life's Accelerated Benefit Rider (ABR) is automatically part of every permanent life insurance policy. With ABR you may choose to receive an advance portion of your policy's death benefit if you are diagnosed with a terminal illness (life expectancy 12 months or less). ABR may or may not be approved in your state. Please see your policy contract for complete details.

The guaranteed columns reflect a guaranteed interest rate of 4.00% and guaranteed cost of insurance rates. Illustration for use in the state of Georgia.

Initial Guideline Premiums: Net Single $218,471.93     Net Level $19,276.58
Maximum Annual Premium that complies with 7-Pay Test: $51,143.96

Columns other than guaranteed show values based on current cost of insurance rates and the interest rate indicated, and these columns are not guaranteed. Current interest rate is determined quarterly.

T 166.40

Non-Guaranteed: This illustration assumes that the non-guaranteed elements currently illustrated will continue unchanged for all years shown. This is not likely to occur and actual results may be more or less favorable and are not guaranteed. THIS SUPPLEMENTAL ILLUSTRATION IS NOT VALID UNLESS ACCOMPANIED BY THE LIFE INSURANCE BASIC POLICY ILLUSTRATION. THIS ILLUSTRATION IS NOT A POLICY CONTRACT
Prepared by JEFFREY THOMAS on January 23, 2004 for delivery in the state of Georgia.

# THE STATE LIFE INSURANCE COMPANY
## Lifestyle Freedom UL ™ - Illustration Cover

## Product Design:

LifeStyle Freedom UL™ is a flexible premium permanent life insurance plan that offers clients maximum protection for their premium.  As with other State Life insurance plans, LifeStyle Freedom UL™ was designed to offer exceptional performance to clients classified as standard (not preferred) or impaired risks.  To these clients, obtaining the coverage they need at low, long-term costs is typically their first priority.  LifeStyle Freedom UL™ offers some of the lowest long-term "current projection" premiums in the market and much more.  LifeStyle Freedom UL™ offers TWO LEVELS of Death Benefit guarantees.

* **Key Features:**
  - Issuable to age 90.
  - Three face amount Bands: $50,000, $100,000 and $250,000 give LifeStyle Freedom UL™ a broad range of competitive performance
  - 10-year no-lapse death benefit guarantee available for all issue ages and ratings.
  - To-age-100 death benefit guarantee available for ages 18 through 89.
  - Occasional tobacco users (non-cigarette smokers and others) may qualify for non-tobacco rates.
  - Table ratings terminate after 20 years.
  - Target premiums increase through table 16 at most ages.

* **Target Markets:**
  - Estate Tax Funding
  - Business cases - Buy/Sell and Key Person
  - Estate transfer - single premium
  - Personal protection
  - Any case where underwriting and price are paramount

* **Plan Specifications:**

  | | |
  |---|---|
  | - Issue Limits: | 0 to 90 (Age Nearest) |
  | - Minimum Amount: | Ages 45 to 90 - $50,000, Ages 0 to 44 -- $100,000 |
  | - Maximum Amount: | None |
  | - Premiums: | Lifestyle Freedom UL™ uses an innovative method of unbundling the expense loads from the COI rates and credited interest, resulting in enhanced performance for rated and higher account value plans, such as single premium. |
  | - Underwriting Rate Classes: | Non-Tobacco: No cigarettes in the past 12 months and urine contains less than 0.5 mgs cotinine (nicotine). Tobacco: Smoked cigarettes in the past 12 months or urine contains 0.5 mgs or more cotinine (nicotine) currently or at any time in the past 12 months. Other nicotine products: Are considered as Non-Tobacco only if the urine contains less than 0.5 mgs cotinine (nicotine) regardless of the amount used. |

The State Life Insurance Company, founded in 1894, has the following ratings:

**A (Excellent) by A.M. Best**
**(3rd out of 15)**
**AA- (Very Strong) by Standard & Poor's**
**(4th out of 21)**

**Offered by:**

JEFFREY THOMAS
1 Main St
Indianapolis, Indiana 46208

SS0032 8/01

D.D.S
Irrv. life ins. Trust

## Prepared by the National Association of Insurance Commissioners

The National Association of Insurance Commissioners is an association of state insurance regulatory officials. This association helps the various insurance departments to coordinate insurance laws for the benefit of all consumers.

### This guide does not endorse any company or policy.

### Important Things to Consider

1. Review your own insurance needs and circumstances. Choose the kind of policy that has benefits that most closely fit your needs. Ask an agent or company to help you.

2. Be sure that you can handle premium payments. Can you afford the initial premium? If the premium increases later and you still need insurance, can you still afford it?

3. Don't sign an insurance application until you review it carefully to be sure all the answers are complete and accurate.

4. Don't buy life insurance unless you intend to stick with your plan. It may be very costly if you surrender during the early years of the policy.

5. Don't drop one policy and buy another without a thorough study of the new policy and the one you have now. Replacing your insurance may be costly.

6. Read your policy carefully. Ask your agent or company about anything that is not clear to you.

7. Review your life insurance program with your agent or company once every few years to keep up with changes in your income and your needs.

### Buying Life Insurance

When you buy life insurance, you want coverage that fits your needs.

First, decide how much you need—and for how long—and what you can afford to pay. Keep in mind the major reason you buy life insurance is to cover the financial effects of unexpected or untimely death. Life insurance can also be one of many ways you plan for the future.

© 2001 National Association of Insurance Commissioners
Reprinted by BISYS Education Services with permission
PRBYDG00101 1/12

Next, learn what kinds of policies will meet your needs and pick the one that best suits you.

Then, choose the combination of policy premium and benefits that emphasizes protection in case of early death, or benefits in case of long life, or a combination of both.

It makes good sense to ask a life insurance agent or company to help you. An agent can help you review your insurance needs and give you information about the available policies. If one kind of policy doesn't seem to fit your needs, ask about others.

### What About the Policy You Have Now?

If you are thinking about dropping a life insurance policy, here are some things you should consider:

• If you decide to replace your policy, don't cancel your old policy until you have received the new one. You then have a minimum period to review your new policy and decide if it is what you wanted.

• It may be costly to replace a policy. Much of what you paid in the early years of the policy you have now, paid for the company's cost of selling and issuing the policy. You may pay this type of cost again if you buy a new policy.

• Ask your tax advisor if dropping your policy could affect your income taxes.

• If you are older or your health has changed, premiums for the new policy will often be higher. You will find it difficult to buy a new policy if you are not insurable.

• You may have valuable rights and benefits in the policy you now have that are not in the new one.

• If the policy you have now no longer meets your needs, you may not have to replace it. You might be able to change your policy or add to it to get the coverage or benefits you now want.

• At least in the beginning, a policy may pay no benefits for some causes of death covered in the policy you have now.

In all cases, if you are thinking of buying a new policy, check with the agent or company that issued your old policy, you may have seen an illustration of the benefits of your policy. Before replacing your policy, ask your agent or company for an updated illustration. Check to see how the policy has performed and what you might expect in the future, based on the amounts the company is paying now.

### How Much Do You Need?

Here are some questions to ask yourself:

• How much of the family income do I provide? If I were to die early, how would my survivors, especially my children, get along? Does anyone else depend on me financially, such as a parent, grandparent, brother or sister?

• Do I have children for whom I'd like to set aside money to finish their education in the event of my death?

• How will my family pay final expenses and repay debts after my death?

• Do I have family members or organizations to whom I would like to leave money?

• Will there be estate taxes to pay after my death?

• How will inflation affect future needs?

As you figure out what you have to meet these needs, count the life insurance you have now, including any group insurance where you work or veteran's insurance. Don't forget Social Security and pension plan survivor's benefits. Add other assets you have: savings, investments, real estate and personal property. Which assets would your family sell or cash in to pay expenses after your death?

### What is the Right Kind of Life Insurance?

All policies are not the same. Some give coverage for your lifetime and others cover you for a specific number of years. Some build up cash values and others do not. Some policies combine different kinds of insurance, and others let you change from one kind of insurance to another. Some policies may offer other benefits while you are still living. Your choice should be based on your needs and what you can afford.

There are two basic types of life insurance: term insurance and cash value insurance. Term insurance generally has lower premiums in the early years, but does not build up cash values that you can use in the future. You may combine cash value life insurance with term insurance for the period of your greatest need for life insurance to replace income.

**Term Insurance** covers you for a term of one or more years. It pays a death benefit only if you die in that term. Term insurance generally offers the largest insurance protection for your premium dollar. It generally does not build up cash value.

You can renew most term insurance policies for one or more terms even if your health has changed. Each time you renew the policy for a new term, premiums may be higher. Ask what the premiums will be if you continue to renew the policy. Also ask if you will lose the right to renew the policy at some age. For a higher premium, some companies will give you the right to keep the policy in force for a guaranteed period at the same price each year. At the end of that time you may need to pass a physical examination to continue coverage, and premiums may increase.

You may be able to trade many term insurance policies for a cash value policy during a conversion period—even if you are not in good health. Premiums for the new policy will be higher than you have been paying for the term insurance.

**Cash Value Life Insurance** is a type of insurance where the premiums charged are higher at the beginning than they would be for the same amount of term insurance. The part of the premium that is not used for the cost of insurance is invested by the company and builds up a cash value that may be used in a variety of ways. You may borrow against a policy's cash value by taking a policy loan. If you don't pay back the loan and the interest on it, the amount you owe will be subtracted from the benefits when you die, or from the cash value if you stop paying premiums and take out the remaining cash value. You can also use your cash value to keep insurance protection for a limited time or to buy a reduced amount without having to pay more premiums. You also can use the cash value to increase your income in retirement or to help pay for needs such as a child's tuition without cancelling the

policy. However, to build up this cash value, you must pay higher premiums in the earlier years of the policy. Cash value life insurance may be one of several types: whole life, universal life and variable life are all types of cash value insurance.

*Whole Life Insurance* covers you for as long as you live if your premiums are paid. You generally pay the same amount in premiums for as long as you live. When you first take out the policy, premiums can be several times higher than what you would pay initially for the same amount of term insurance. But they are smaller than the premiums you would eventually pay if you were to keep renewing a term policy until your later years.

Some whole life policies let you pay premiums for a shorter period such as 20 years, or until age 65. Premiums for these policies are higher since the premium payments are made during a shorter period.

*Universal Life Insurance* is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. Increases may require proof that you qualify for the new death benefit. The premiums you pay (less expense charges) go into a policy account that earns interest. Charges are deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value.

*Variable Life Insurance* is a kind of insurance where the death benefits and cash values depend on the investment performance of one or more separate accounts, which may be invested in mutual funds or other investments allowed under the policy. Be sure to get the prospectus from the company when buying this kind of policy and STUDY IT CAREFULLY. You will have higher death benefits and cash value if the underlying investments do well. Your benefits and cash value will be lower or may disappear if the investments you chose didn't do as well as you expected. You may pay an extra premium for a guaranteed death benefit.

## Life Insurance Illustrations

You may be thinking of buying a policy where cash values, death benefits, dividends or premiums may vary based on events or situations the company does not guarantee (such as interest rates). If so, you may get an illustration from the agent or company that helps explain how the policy works. The illustration will show how the benefits that are not guaranteed will change as interest rates and other factors change. The illustration will show you what the company guarantees. It will also show you what could happen in the future. Remember that nobody knows what will happen in the future. You should be ready to adjust your financial plans if the cash value doesn't increase as quickly as shown in the illustration. You will be asked to sign a statement that says you understand that some of the numbers in the illustration are not guaranteed.

## Finding a Good Value in Life Insurance

After you have decided which kind of life insurance is best for you, compare similar policies from different companies to find which one is likely to give you the best value for your money. A simple comparison of the premiums is not enough. There are other things to consider. For example:

• Do premiums or benefits vary from year to year?
• How much do the benefits build up in the policy?
• What part of the premiums or benefits is not guaranteed?
• What is the effect of interest on money paid and received at different times on the policy?

Remember that no one company offers the lowest cost at all ages for all kinds and amounts of insurance. You should also consider other factors:

• How quickly does the cash value grow? Some policies have low cash values in the early years that build quickly later on. Other policies have a more level cash value build-up. A year-by-year display of values and benefits can be very helpful. (The agent or company will give you a policy summary or an illustration that will show benefits and premiums for selected years.)

• Are there special policy features that particularly suit your needs?
• How are nonguaranteed values calculated? For example, interest rates are important in determining policy returns. In some companies, increases reflect the average interest earnings on all of that company's policies regardless of when issued. In others, the return for policies issued in a recent year, or a group of years, reflects the interest earnings on that group of policies; in this case, amounts paid are likely to change more rapidly when interest rates change.



# Life Insurance Buyer's Guide

This guide can help you when you shop for life insurance. It discusses how to:

• Find a Policy That Meets Your Needs and Fits Your Budget
• Decide How Much Insurance You Need
• Make Informed Decisions When You Buy a Policy

1996/2001 NAIC Model Reprinted by

# FedEx.

Express



Tracking No: WTS-P0000012330

610A, 610A
610A

Phone:          Unspecified
Received On: 08-02-2017 09:12am

ORIGIN ID:TOCA        (770) 614-6415
MALISSA BROWN
C DAVID JOYNER PC
1305 MALL OF GEORGIA BLVD

BUFORD, GA 30519
UNITED STATES US

SHIP DATE: 31JUL17
ACTWGT: 1.00 LB
CAD: 7347315/INET3920

BILL SENDER

TO  CLAIMS DEPARTMENT
ONE AMERICA
250 W. NORTH STREET

INDIANAPOLIS IN 46202
(800) 833-5569        REF: DENISE D. SMITH
INV:
PC:                   DEPT:



FedEx.
Express

TUE - 01 AUG 3:00P
STANDARD OVERNIGHT

TRK#  7797 7518 2080
0201

46202

ND G

Extremely Urgent

# EXHIBIT E



STATE OF GEORGIA
COUNTY OF GWINNETT

# TRUST AGREEMENT FOR TRENTON LANE SMITH TRUST

This Trust Agreement dated June 25ᵗ, 2004, between **DENISE D. SMITH**, of 8935

Firestone Circle, Duluth, Forsyth County, Georgia, hereinafter referred to as "Settlor" and **C.**

**DAVID JOYNER**, of 1400 Buford Highway, Suite J-1, Buford, Gwinnett County, Georgia,

hereinafter referred to as Trustee.

In consideration of the mutual covenants and promises set forth herein, Settlor and

Trustee agree as follows:

### Section I
### Transfer in Trust

Settlor assigns, transfers and conveys to Trustee as Trustee for the **TRENTON LANE**

**SMITH TRUST**, the property described in the attached "Schedule A", which is incorporated

herein by this reference.   The receipt of such property is acknowledged by Trustee.   Such

property, hereafter designated the Trust Estate, shall be held by the Trustee in Trust for the uses

and purposes and under the terms and conditions as are set forth in this instrument.

The Trust Estate shall consist of all property now or in the future subject to this trust, and

shall be held, managed, and distributed in accordance with the provisions contained in this

instrument.

### Section II
### Purpose of Trust

The purpose of this Trust shall be the proper care, management and distribution of the

principal and income derived from the property set forth in "Schedule A", or in any additional

schedules, on behalf of **TRENTON LANE SMITH**, a minor child, the sole descendant of

Settlor, for his proper education, maintenance, health and support.

This enumeration is to serve only as a guide and shall not be construed to restrict the discretionary powers so conferred on the Trustee herein.

### Section III
### Duration of Trust

This trust shall continue from the date set forth above until **TRENTON LANE SMITH**, the beneficiary hereof, attains the age of twenty-five (25) years or graduates from an accredited college, whichever shall first occur.

### Section IV
### Disposition of Principal and Income

Trustee shall administer and manage the Trust Estate, collect the income therefrom, and after payment of all taxes and assessments, if any, and all charges incident to the management of the estate, apply and dispose of the net income and principal of the Trust Estate as follows:

Trustee may apply so much of the principal in the Trust Estate, and income derived therefrom, at such time or times as, in Trustee's sole discretion, Trustee may deem advisable for the proper education, maintenance, health and support of **TRENTON LANE SMITH**, the beneficiary hereof.

Income accrued on Trust property when received by the Trustee shall be treated as any other income.   Income accrued and held undistributed by Trustee at the termination of this Trust shall be paid over to the beneficiary hereunder.

Trustee shall make all payments to beneficiary, unless he is a minor or is suffering from a disability at the time that this Trust is fully funded.   Under these circumstances, the Trustee shall make all payments to the guardian of the beneficiary as if designated by a proper Court or as

is designated in Settlor's Last Will and Testament.

## Section V
## Powers of Trustee

Trustee shall have all those powers conferred on him by the laws of the State of Georgia

and which are codified in the Official Code of Georgia annotated, including any amendments or

additions thereto.

Trustee shall have such additional powers as Settlor may confer on him by any future

instrument which is set forth in writing and delivered to Trustee.

It is specifically provided, however, that Trustee may serve without the necessity of

posting bond or from making an inventory or accounting to any Court whatsoever.    The Trustee

shall be required to make a full accounting to the beneficiary upon termination of this Trust or at

such times as beneficiary requests an accounting in writing, not to exceed two (2) accountings

per year.

## Section VI
## Compensation of Trustee

The Trustee shall not receive compensation for ordinary services performed pursuant to

this Trust Agreement.    However, he may reimburse himself for any and all expenses associated

with the proper management and distribution of this Trust.

## Section VII
## Appointment of Successor Trustee

Settlor, while living and competent, may, by written instrument delivered to Trustee,

terminate the trusteeship of such trustee and nominate and appoint a successor.    Said successor

Trustee shall enjoy the same powers and privileges, set forth herein for Trustee, unless amended

in writing by Settlor.

Upon appointment of successor Trustee, the original Trustee shall have thirty (30) days from the receipt of written notice of termination of his Trusteeship, within which he must deliver any and all property of the Trust in his possession or control to the successor Trustee.

### Section VIII
### Notices

Any notice required by this instrument to be sent to Trustee or Settlor or to the income beneficiary shall be sent to such person at his or her last known address, or if Trustee has been notified in writing of the address of such person for such purpose, to such address, or if a guardian has been appointed for such person and the Trustee has been notified in writing of such appointment, to such guardian.

### Section IX
### Severability of Provisions

If any provision of this instrument is unenforceable, the remaining provisions shall, nevertheless, remain in full force and effect.

### Section X
### Governing Law

This Trust has been accepted by Trustee in the State of Georgia.   The validity, construction, and all rights under this Trust shall be governed by the laws of the State of Georgia.

### Section XI
### Additions to Trust

Other property acceptable to Trustee may be added to this Trust by any person, so long as said property is added for the benefit of the beneficiary set forth herein.

## Section XII
### Irrevocability

This trust shall be **IRREVOCABLE**.

The undersigned Settlor, **DENISE D. SMITH**, certifies that she has read this declaration of trust and that the same fully and accurately sets out the terms, trusts and conditions under which the Trust Estate, described herein, shall be held, managed and disposed of by Trustee. Settlor, by her signature below, does confirm and ratify such declaration of Trust and all provisions set forth above.

## Section XIII
### Binding Effect

This agreement shall be binding on Settlor, Settlor's executor, administrator, successors and assigns, and Trustee and Trustee's successors and assigns.

IN WITNESS WHEREOF, Settlor and Trustee have executed this agreement at 1400 Buford Highway, Suite J-1, Buford, Georgia the day and year first above written.

_____
**DENISE D. SMITH, SETTLOR**

_____
**C. DAVID JOYNER, TRUSTEE**

_____
**WITNESS**

_____
**WITNESS**

_____
**NOTARY PUBLIC**

NOTARY PUBLIC
JACKSON COUNTY-GEORGIA
MY COMMISSION EXPIRES APRIL 26, 2008

# EXHIBIT F

State of Georgia

County of Cobb

## AFFIDAVIT OF TRENTION LANE SMITH IN SUPPORT OF PLAINTIFF'S DEMAND FOR SETTLEMENT AGAINST TRUIST BANK INC.

Personally appeared before the undersigned officer, duly authorized by law to administer oaths, TRENTON LANE SMITH, who upon being sworn to speak the truth, deposes, and makes the following statements under oath, as being relevant and material in support of the undersigned's demand for settlement against Truist Bank Inc.:

1. I am over eighteen (18) years of age, suffering no legal disability, and I am fully competent to make the statements herein.
2. My date of birth is December13, 1994.
3. I reside at 146 Ennisbrook Drive SE, Smyrna, GA 30082.
4. I am the sole and only heir-at-law of my mother Denise Diane Smith ("Ms. Smith")
5. Ms. Smith died on July 9, 2017.
6. Specifically, at the time of my mother's death there was in place an executed Trust Agreement for the benefit of me, Trenton Lane Smith.
7. In accordance with the Trust Agreement Charles David Joyner was to serve as trustee over the assets that were payable only to me, which, upon my mother's death, consisted of life insurance proceeds in the amount of $905,797.31.
8. The Trust Agreement provided that C. David Joyner was to pay me all proceeds in the Trust Furst at the time I attained twenty-five (25) years of age, or <u>when I graduated from an accredited college</u>, whichever occurred first.
9. I become aware of the existence of the Trust after the death of my mother from my grandmother Ruby Smith who was the executor of my mother's will.
10. I never saw the details of the Trust Agreement or become aware of the conditions of the Trust Agreement until 2024.
11. At the time of my mother's death on July 9, 2017, <u>I had already graduated from an accredited college.</u>
12. In 2017 I reached out to C. David Joyner to inquire about the Trust Agreement he fraudulently concealed the conditions of the Trust and informed me that I did not have access to the funds in the Trust until I was 25 years old. Furthermore, he stated that at the age of 25 I would only have access to 50% of the Trust and at the age of 35 I would have access to the remaining 50%.
13. Due to the fact he was the attorney and my mother had chosen him, I relied presumably on his expertise in this area.
14. I turned 25 years old on December 13, 2019 and in January of 2020 I began to reach out to C. David Joyner to inquire about gaining access to my Trust.

15. In response to my request to receive Trust Fund proceeds, C. David Joyner provided me with two small monetary distributions. One in the amount of $80,000 in February of 2020 and the other in the amount of $50,000 in May of 2022.

16. It was only after C. David Joyner's death that I was informed that he had lied about the terms of the Trust Agreement.

17. I was never aware that a check made payable to me was sent by State Life Insurance Company to C. David Joyner.

18. I never authorized C. David Joyner to sign the check made payable to me on my behalf and deposit it.

19. I only became aware of the check made payable to me this year in 2024 after my attorneys were able to obtain a copy of it from Truist Bank.

20. My attorneys in this matter are Oto Ekpo from Finch McCranie229 Peachtree Street N.E. Suite 2500 Atlanta, GA 30303; email: oto@finchmccranie.com and Rob Ballard, Robert G. Ballard, P.C., One Glenlake Parkway, Suite 700, Atlanta, Ga 30328; email:

Further Affiant Sayeth Not.

Plaintiff, Trenton Lane Smith

This 23rd day of July, 2024.

Sworn to and subscribed

Before me this 23rd

Day of July, 2024

TOI WALKER-TSIKUDO
COMM. EXPIRES:
NOTARY PUBLIC
10/21/2026
HENRY COUNTY, GEORGIA

# EXHIBIT G

Thanks,
Trent

Begin forwarded message:

**From:** David Joyner <djoyner@cdavidjoynerpc.com>
**Date:** February 5, 2020 at 6:18:16 PM EST
**To:** Trent Smith <tlsmith932@gmail.com>
**Subject: RE: Trust Statements**

Trent,

I hope you are doing well.

I am happy to provide information for this but will need to talk with Jim since this is not a traditional type Trust, and I will be turning over all of your monies to you prior to your closing.   I will make sure he has what he needs and will not slow up the process.

I have prepared a separate e-mail so that you understand where we are.   I am very happy for you and glad to help you in any way that I can.

Kindest regards,

David Joyner

C. DAVID JOYNER, P.C.
1305 Mall of Georgia Blvd.,
Suite 130
Buford, Georgia 30519
Office (770) 614-6415
Fax (770) 614-7678
e-mail:  djoyner@cdavidjoynerpc.com

*The information contained in this electronic mail message is attorney privileged and confidential information intended only for the use of the individual or entity named.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of the communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone at 770-614-6415 or by reply email and delete this message.  Do not copy or distribute it to anyone other than the intended recipient.*

**From:** Trent Smith [mailto:tlsmith932@gmail.com]
**Sent:** Wednesday, February 5, 2020 6:00 PM
**To:** David Joyner <djoyner@cdavidjoynerpc.com>
**Subject:** Trust Statements

Evening David,
I am currently submitting all financial documentation to Jim so he may process my mortgage loan. One of the items needed is as follows:

- Copy of Trust, all pages, if funds for closing derived from Trust (If from Trust, please provide most recent 60 day or quarterly statements, all pages)

If you could please get me those documents as soon as possible, that would be great. The current deadline for uploading is Friday, EOB.

Thanks,
Trent

# EXHIBIT H

**From:** David Joyner <djoyner@cdavidjoynerpc.com>
**Date:** February 5, 2020 at 6:26:37 PM EST
**To:** Trent Smith <tlsmith932@gmail.com>
**Subject: Personal and Confidential**

Trent,

I hope this finds you doing well.

First, I am happy to have had the opportunity to review the contract on the home you are purchasing.   I knew both Mike Healy and Jim Cheeley would do a great job for you and I trust them implicitly.

There is nothing unusual about the contract.   Additionally, the closing attorney will conduct a title examination to determine if there are any issues with passing clear title to you when you purchase the home.   If there are issues, those will be reported.   The closing attorney has the responsibility to make sure the title is clear when the deed is signed over to you.   If you want me to be with you at closing to make sure everything goes smoothly, I am happy to do so.   I have handled thousands of transactions in my career and can make quick work out of reviewing the documents.

As you will recall, soon after your wonderful mother passed away, I got involved in the estate matters on her behalf and yours.   My responsibility, which I volunteered for, was to open the estate and do everything I could to preserve the assets for you.   We did that and ultimately sold multiple properties, including the trucks and trailers.   Unfortunately, this did not result in sufficient funds to pay off all of the creditors.   What I ultimately had to do was work with the creditors and convince them to accept less than the total amounts due and owing to them.   Bank of America was most diffficult but finally came to their senses recently and have been paid off.   I am currently waiting on all releases to be signed by the creditors and presented to me so that I can finish my work for you and the Estate.   In the meantime, we have filed to close the estate as instructed by the Probate Judge in Forsyth County since all estate business has been concluded.

Please note, the lienholders on the home, following foreclosure, had the right to pursue a deficiency (the amount left owing following foreclosure).   They have not done so, and I do not anticipate they will.   I plan to fight them if they do.

1

Your mother and I had many conversations over the years concerning you and your future.   She asked me to be Trustee for you going back to probably before Julie was born in 2005.   She wanted to make sure you were ok going forward if something ever happened to her.   What she instructed me to do was hold all funds in trust for you until you were 25.   She and her accountants at the time had me sign documents annually pertaining to this, including tax documents.   Now that you are 25, I am in the process of turning everything over to you.

Following her death, I tried to determine if there were trust funds located somewhere that needed to be marshalled.   In particular, I was focused on the sale of the McDonald's restaurant several years ago.   Unfortunately, the only funds located was the life insurance policy with "The State Life Insurance Company" which I located in my file soon after her passing.   The policy had a face value of 1 million.   At some point your mother borrowed on that policy, which is not terribly unusual, and owed over $106,000.00 on that loan, with interest, at the time of her passing.   I confirmed their accounting was correct and made sure they had proper documentation, which you signed, in order to receive the remaining portion.   They gave us a hard time initially but finally released everything.   I also insisted on interest being paid on the remaining balance on the policy of 893K.   They added back almost 13k (4.5%) in interest which resulted in their paying $905,797.31.   That has now grown to approximately 1.1 m.

I regret we did not sit down before now, as you and I talked about doing back some time ago.   However, it is all a mute issue now since I will be stepping aside and you will be in charge of your money very soon.

At this point I am getting everything prepared for you.   I have an accountant, Jeff Forrestall, who is a good man and will be assisting me with this.   He and I met in my office last month after returning from the holidays. The plan is to get this finished right away and certainly before you close on your home.   I ask that you be a little patient with me as I finish this for you.   I am trying to make sure there are no tax issues or anything else that would need to be addressed or come back to bite us.   I would prefer to postpone our meeting briefly until I have everything from him, including his advice on any tax issues in order that I might share that with you.   Please understand I am a trial lawyer and not a tax lawyer.   While I certainly am in charge of a great deal of money for my clients, I am also not a professional who serves as a Trustee on a regular basis.   Therefore, the advice from a professional is definitely needed and appreciated at this juncture.   When we meet, I can then turn everything over to you.

Please know I look forward to seeing you soon and to assisting you with the closing in any way that I can.   I am very happy for you and proud of the man you have become.

Kindest regards,

David Joyner

C. DAVID JOYNER, P.C.
1305 Mall of Georgia Blvd.,
Suite 130
Buford, Georgia 30519
Office (770) 614-6415
Fax (770) 614-7678
e-mail: djoyner@cdavidjoynerpc.com

2

# EXHIBIT I

 2:18 ◀



# ONLINE STATEMENTS

For hearing Impaired client

TRENT

## Standard Checking Account Summary
**Account number:**

**Overdraft Protection** has not been established for this account.
Please contact us if you would like to set up this service.
Overdraft Coverage
- Your account is currently
Opted-Out.

### Balance Summary

| Beginning balance | Deposits and other additions | Checks and other deductions | Ending balance |
|---|---|---|---|
| 7,902.98 | 88,589.11 | 7,178.33 | 89,313.76 |
| | | Average monthly balance | Charges and fees |
| | | 31,061.20 | .00 |

### Transaction Summary

| Checks paid/withdrawals | Debit Card POS signed transactions | Debit Card/Bankcard POS PIN transactions | |
|---|---|---|---|
| 2 | 19 | 0 | |
| Total ATM transactions | PNC Bank ATM transactions | Other Bank ATM transactions | |
| 1 | 1 | 0 | |

## Activity Detail

### Deposits and Other Additions

There were 6 D
Additions totalli

| Date | Amount | Description |
|---|---|---|
| 01/17 | 1,898.01 | Direct Deposit - Payroll EQUIFAX, INC 200117E90034191 |
| 01/24 | 500.00 | Mobile Deposit Reference No. 075139208 |
| 01/31 | 1,898.01 | Direct Deposit - Payroll EQUIFAX, INC 200131E90034191 |
| 02/07 | 80,000.00 | Deposit Reference No. 047737157 |
| 02/07 | 2,395.09 | Mobile Deposit Reference No. 074816144 |
| 02/14 | 1,898.00 | Direct Deposit - Payroll EQUIFAX, INC 200214E90034191 |

# Standard Checking Statement

For 24-hour information sign on to PNC Bank Online Banking
on pnc com

Account Number            - continued

For the period   **01/16/2020**
TRENTON LANE SMITH
Primary account number:   53
Page 2 of 3

## Checks and Substitute Checks

| Check number | Amount | Date paid | Reference number | Check number | Amount |
|---|---|---|---|---|---|
| 119 | 385.00 | 02/06 | 083495405 | 120 | 3.000.00 |

* Gap in check sequence

There were 2 c
$3,385.00.

## Banking/Debit Card Withdrawals and Purchases

There were 20
Machine/Debit
totaling $1,100.

| Date | Amount | Description |
|---|---|---|
| 01/21 | 49.99 | 4691 Debit Card Purchase Microsoft*Xbox |

# EXHIBIT J

4842

**C. DAVID JOYNER, PC**
1305 MALL OF GEORGIA BLVD STE. 130
BUFORD, GEORGIA 30519
(770) 614-6415

64-10/610

DATE 5-31-2022

PAY TO THE ORDER OF _____ Trent Smith _____ $ 50,000.⁰⁰

_____ Fifty thousand & ⁰⁰/₀₀ _____ DOLLARS

**SUNTRUST**  ACH RT 061000104

FOR _____ Trent attorney _____

⑆00000484 2⑆  ⑆061000104⑆  0000 6550 65⑆

20220531   004600382254   04000748004

© Copyright 2010. The PNC Financial Services Group, Inc. All Rights Reserved.

# EXHIBIT K

## GEORGIA DEATH CERTIFICATE

State File Number  **2017GA000040485**

| 1. DECEDENT'S LEGAL FULL NAME (First, Middle, Last) **DENISE DIANE SMITH** | 1a. IF FEMALE, ENTER LAST NAME AT BIRTH **SMITH** | 2. SEX **FEMALE** | 2a. DATE OF DEATH (Mo., Day, Year) **ACTUAL DATE OF DEATH 07/09/2017** |
|---|---|---|---|

| 3. SOCIAL SECURITY NUMBER | 4a. AGE (Years) **60** | 4b. UNDER 1 YEAR Mos. | Days | 4c. UNDER 1 DAY Hours | Mins. | 5. DATE OF BIRTH (Mo., Day, Year) **03/11/1957** |
|---|---|---|---|---|---|---|

| 6. BIRTHPLACE **GEORGIA** | 7a. RESIDENCE - STATE **GEORGIA** | 7b. COUNTY **FORSYTH** | 7c. CITY, TOWN **DULUTH** | |
|---|---|---|---|---|

| 7d. STREET AND NUMBER **8935 FIRESTONE CIRCLE** | 7e. ZIP CODE **30097** | 7f. INSIDE CITY LIMITS? **UNKNOWN** | 8. ARMED FORCES? **NO** |
|---|---|---|---|

| 8a. USUAL OCCUPATION **ENTREPRENEUR** | 8b. KIND OF INDUSTRY OR BUSINESS **TRUCKING** |
|---|---|

| 9. MARITAL STATUS **NEVER MARRIED** | 10. SPOUSE NAME | 11. FATHER'S FULL NAME (First, Middle, Last) **LEMUEL H SMITH** |
|---|---|---|

| 12. MOTHER'S MAIDEN NAME (First, Middle, Last) **RUBY M WHITEHEAD** | 13a. INFORMANT'S NAME (First, Middle, Last) **TRENT SMITH** | 13b. RELATIONSHIP TO DECEDENT **SON** |
|---|---|---|

| 13c. MAILING ADDRESS **9075 CAMPESTRAL COURT DULUTH GEORGIA 30097** | 14. DECEDENT'S EDUCATION **ASSOCIATE DEGREE** |
|---|---|

| 15. ORIGIN OF DECEDENT (Spanish/Hispanic/Latino) **NO, NOT SPANISH/HISPANIC/LATINO** | 16. DECEDENT'S RACE (White, Black, American Indian, etc.) (Specify) **WHITE** |
|---|---|

| 17a. IF DEATH OCCURRED IN HOSPITAL | 17b. IF DEATH OCCURRED OTHER THAN HOSPITAL (Specify) **DECEDENT'S HOME** |
|---|---|

| 18. HOSPITAL OR OTHER INSTITUTION NAME (If not in either give street and no.) **8935 FIRESTONE CIRCLE** | 19. CITY, TOWN or LOCATION OF DEATH **DULUTH** | 20. COUNTY OF DEATH **FORSYTH** |
|---|---|---|

| 21. METHOD OF DISPOSITION (specify) **CREMATION** | 22. PLACE OF DISPOSITION **CREMATION SOCIETY OF GEORGIA 1826 MARIETTA BOULEVARD ATLANTA GEORGIA 30318** | 23. DISPOSITION DATE (Mo., Day, Year) **07/11/2017** |
|---|---|---|

| 24a. EMBALMER'S NAME | 24b. EMBALMER LICENSE NO. | 25. FUNERAL HOME NAME **CREMATION SOCIETY OF GA INC** |
|---|---|---|

| 25a. FUNERAL HOME ADDRESS **1826 MARIETTA BLVD NW ATLANTA GEORGIA 30377** | | |
|---|---|---|
| 26a. SIGNATURE OF FUNERAL DIRECTOR **SHANE MOON** | 26b. FUN. DIR. LICENSE NO **4599** | AMENDMENTS |

| 27. DATE PRONOUNCED DEAD (Mo., Day, Year) **07/09/2017** | 28. HOUR PRONOUNCED DEAD **11:49 AM** | |
|---|---|---|
| 29a. PRONOUNCER'S NAME **PAUL W HOLBROOK** | 29b. LICENSE NUMBER **9358941** | 29c. DATE SIGNED **07/09/2017** |

| 30. TIME OF DEATH **11:49 AM** | 31. WAS CASE REFERRED TO MEDICAL EXAMINER **YES** |
|---|---|

32. Part I. Enter the chain of events–diseases, injuries, or complications that directly caused the death, DO NOT enter terminal events such as cardiac arrest, respiratory arrest, Or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE.

Approximate interval between onset and death

IMMEDIATE CAUSE (Final disease or condition resulting in death)

A. **CARDIAC ARREST**  **IMMEDIATE**

Due to, or as a consequence of

B.

Due to, or as a consequence of

C.

Due to, or as a consequence of

D.

| Part II. Enter significant conditions contributing to death but not related to cause given in Part 1A. If female, indicate if pregnant or birth occurred within 90 days of death. **HYPERTENSION** | 33. WAS AUTOPSY PERFORMED? **NO** | 34. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|

| 35. TOBACCO USE CONTRIBUTED TO DEATH **NO** | 36. IF FEMALE (range 10-54) PREGNANT **NOT APPLICABLE** | 37. ACCIDENT, SUICIDE, HOMICIDE, UNDETERMINED (Specify) **NATURAL** |
|---|---|---|

| 38. DATE OF INJURY (Mo., Day, Year) | 39. TIME OF INJURY | 40. PLACE OF INJURY (Home, Farm, Street, Factory, Office, Etc.) (Specify) | 41. INJURY AT WORK? (Yes or No) |
|---|---|---|---|

| 42. LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) |
|---|

| 43. DESCRIBE HOW INJURY OCCURRED | 44. IF TRANSPORTATION INJURY |
|---|---|

| 45. To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated. Medical Certifier (Name, Title, License No.) | 46. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. Medical Examiner/Coroner (Name, Title, License No.) **/S/ PAUL W HOLBROOK Medical Examiner/Coroner 9358941** |
|---|---|

| 45a. DATE SIGNED (Mo., Day, Year) | 45b. HOUR OF DEATH | 46a. DATE SIGNED (Mo., Day, Year) **07/13/2017** | 46b. HOUR OF DEATH **11:49 AM** |
|---|---|---|---|

| 47. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH **PAUL W HOLBROOK 110 E MAIN STREET CUMMING GEORGIA 30040** | |
|---|---|
| 48.REGISTRAR (Signature) **/S/ CYNTHIA M. BUSKEY** | 49. DATE FILED - REGISTRAR (Mo., Day, Year) **07/13/2017** |

Form 3903 (Rev. 04/2012), GEORGIA DEPARTMENT OF PUBLIC HEALTH

# EXHIBIT L

## GEORGIA DEATH CERTIFICATE

State File Number **2023GA000003229**

| 1. DECEDENT'S LEGAL FULL NAME (First, Middle, Last) | 1a. IF FEMALE, ENTER LAST NAME AT BIRTH | 2. SEX | 2a. DATE OF DEATH (Mo., Day, Year) |
|---|---|---|---|
| **CHARLES DAVID JOYNER** | | **MALE** | **ACTUAL DATE OF DEATH 01/17/2023** |

| 3. SOCIAL SECURITY NUMBER | 4a. AGE (Years) | 4b. UNDER 1 YEAR Mos. | 4c. UNDER 1 DAY Days Hours Mins. | 5. DATE OF BIRTH (Mo., Day, Year) |
|---|---|---|---|---|
| | **56** | | | **09/12/1966** |

| 6. BIRTHPLACE | 7a. RESIDENCE - STATE | 7b. COUNTY | | 7c. CITY, TOWN |
|---|---|---|---|---|
| **GEORGIA** | **GEORGIA** | **GWINNETT** | | **BUFORD** |

| 7d. STREET AND NUMBER | 7e. ZIP CODE | 7f. INSIDE CITY LIMITS? | 8. ARMED FORCES? |
|---|---|---|---|
| **2815 DRAYTON HALL DRIVE** | **30519** | **NO** | **NO** |

| 8a. USUAL OCCUPATION | 8b. KIND OF INDUSTRY OR BUSINESS |
|---|---|
| **ATTORNEY** | **LAW PRACTICE** |

| 9. MARITAL STATUS | 10. SPOUSE NAME | 11. FATHER'S FULL NAME (First, Middle, Last) |
|---|---|---|
| **MARRIED** | **CASSANDRA JOSETTE PHILLIPS** | **CHARLES ESTES JOYNER** |

| 12. MOTHER'S MAIDEN NAME (First, Middle, Last) | 13a. INFORMANT'S NAME (First, Middle, Last) | 13b. RELATIONSHIP TO DECEDENT |
|---|---|---|
| **SANDRA WALKER** | **CASSANDRA JOYNER** | **WIFE** |

| 13c. MAILING ADDRESS | 14. DECEDENT'S EDUCATION |
|---|---|
| **2815 DRAYTON HALL DRIVE BUFORD GEORGIA 30519** | **DOCTORATE DEGREE** |

| 15. ORIGIN OF DECEDENT (Spanish/Hispanic/Latino) | 16. DECEDENT'S RACE (White, Black, American Indian, etc.) (Specify) |
|---|---|
| **NO, NOT SPANISH/HISPANIC/LATINO** | **WHITE** |

| 17a. IF DEATH OCCURRED IN HOSPITAL | 17b. IF DEATH OCCURRED OTHER THAN HOSPITAL (Specify) | 20. COUNTY OF DEATH |
|---|---|---|
| **EMERGENCY ROOM/OUTPATIENT** | | **GWINNETT** |

| 18. HOSPITAL OR OTHER INSTITUTION NAME (If not in either give street and no.) | 19. CITY, TOWN or LOCATION OF DEATH |
|---|---|
| **NORTHSIDE HOSPITAL GWINNETT** | **LAWRENCEVILLE** |

| 21. METHOD OF DISPOSITION (specify) | 22. PLACE OF DISPOSITION | 23. DISPOSITION DATE (Mo., Day, Year) |
|---|---|---|
| **CREMATION** | **LAWRENCEVILLE CREMATORY 288 HURRICANE SHOALS ROAD NE LAWRENCEVILLE GEORGIA 30046** | **01/24/2023** |

| 24a. EMBALMER'S NAME | 24b. EMBALMER LICENSE NO. | 25. FUNERAL HOME NAME |
|---|---|---|
| **NOT EMBALMED** | | **HAMILTON MILL MEMORIAL CHAPEL INC** |

| 25a. FUNERAL HOME ADDRESS |
|---|
| **3481 HAMILTON MILL ROAD BUFORD GEORGIA 30519** |

| 26a. SIGNATURE OF FUNERAL DIRECTOR | 26b. FUN. DIR. LICENSE NO | AMENDMENTS |
|---|---|---|
| **WILLIAM M MADDOX** | **4149** | |

| 27. DATE PRONOUNCED DEAD (Mo., Day, Year) | 28. HOUR PRONOUNCED DEAD |
|---|---|
| **01/17/2023** | **09:03 PM** |

| 29a. PRONOUNCER'S NAME | 29b. LICENSE NUMBER | 29c. DATE SIGNED |
|---|---|---|
| **DUANE JURMA** | **082835** | **01/17/2023** |

| 30. TIME OF DEATH | 31. WAS CASE REFERRED TO MEDICAL EXAMINER |
|---|---|
| **09:03 PM** | **YES** |

| 32. Part I. Enter the chain of events-diseases, injuries, or complications that directly caused the death, DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | Approximate interval between onset and death |
|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) **A. ATHEROSCLEROTIC CORONARY ARTERY DISEASE WITH THROMBOSIS OF RIGHT CORONARY ARTERY** | **UNKNOWN** |
| Due to, or as a consequence of **B.** | |
| Due to, or as a consequence of **C.** | |
| Due to, or as a consequence of **D.** | |

| Part II. Enter significant conditions contributing to death but not related to cause given in Part 1A. If female, indicate if pregnant or birth occurred within 90 days of death. | 33. WAS AUTOPSY PERFORMED? | 34. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? |
|---|---|---|
| | **YES** | **YES** |

| 35. TOBACCO USE CONTRIBUTED TO DEATH | 36. IF FEMALE (range 10-54) PREGNANT | 37. ACCIDENT, SUICIDE, HOMICIDE, UNDETERMINED (Specify) |
|---|---|---|
| **UNKNOWN** | **NOT APPLICABLE** | **NATURAL** |

| 38. DATE OF INJURY (Mo., Day, Year) | 39. TIME OF INJURY | 40. PLACE OF INJURY (Home, Farm, Street, Factory, Office, Etc.) (Specify) | 41. INJURY AT WORK? (Yes or No) |
|---|---|---|---|
| | | | |

| 42. LOCATION OF INJURY (Street, Apartment Number, City or Town, State, Zip, County) |
|---|
| |

| 43. DESCRIBE HOW INJURY OCCURRED | 44. IF TRANSPORTATION INJURY |
|---|---|
| | |

| 45. To the best of my knowledge death occurred at the time, date and place and due to the cause(s) stated. Medical Certifier (Name, Title, License No.) | 46. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. Medical Examiner/Coroner (Name, Title, License No.) |
|---|---|
| | **/S/ CAROL A TERRY MD ME** |

| 45a. DATE SIGNED (Mo., Day, Year) | 45b. HOUR OF DEATH | 46a. DATE SIGNED (Mo., Day, Year) | 46b. HOUR OF DEATH |
|---|---|---|---|
| | | **01/23/2023** | **09:03 PM** |

| 47. NAME, ADDRESS, AND ZIP CODE OF PERSON COMPLETING CAUSE OF DEATH |
|---|
| **CAROL A TERRY 320 HURRICANE SHOALS ROAD LAWRENCEVILLE GEORGIA 30046** |

| 48. REGISTRAR (Signature) | 49. DATE FILED - REGISTRAR (Mo., Day, Year) |
|---|---|
| **/S/ CYNTHIA M. BUSKEY** | **01/24/2023** |

Form 3903 (Rev. 04/2012), GEORGIA DEPARTMENT OF PUBLIC HEALTH

# EXHIBIT M

E-FILED IN OFFICE - CE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
23-A-05262-9
11/13/2023 5:16 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
### STATE OF GEORGIA

IN RE: C. DAVID JOYNER, P.C.,

        Defendant.

SHAY RICHARDSON,

        Plaintiff,

v.

C. DAVID JOYNER, P.C., CHARLES DAVID
JOYNER, and CASSANDRA JOYNER,

        Defendants.

CIVIL ACTION FILE
NO. 23-A-5262-9

## MOTION FOR LEAVE TO AMEND TO ADD PARTIES AND FOR SUBSTITUTION OF PARTIES

COMES NOW, Shay Richardson, Plaintiff in the captioned matter, and moves for leave to amend to add parties and for substitution of parties. A copy of the proposed Second Amended Complaint is attached hereto as Exhibit "1". In support of this Motion, Plaintiff states:

### BACKGROUND

1.

On or about June 22, 2023, Plaintiff filed the initial complaint in this matter, asserting claims against C. David Joyner, P.C. (the "Law Firm"), Charles David Joyner ("Mr. Joyner"), and Cassandra Joyner ("Mrs. Joyner") for legal malpractice, breach of fiduciary duty, fraud, conversion, trover, unjust enrichment, constructive trust and disgorgement of funds, injunctive relief, attorney's fees, and punitive damages.

1

2.

As alleged in further detail in the initial complaint and the first amended complaint, Plaintiff was a client of Mr. Joyner and the Law Firm, which she hired to file a petition to modify a trust to make her trustee. At Mr. Joyner's urging, Plaintiff transferred over $2 million to the Law Firm IOLTA trust account for safekeeping while the matter of the trusteeship was resolved.[1] Unbeknownst to Plaintiff, however, Mr. Joyner did not hold Plaintiff's funds for safekeeping, but instead immediately began spending the deposited funds to make payments to himself, his wife Mrs. Joyner, and, as detailed below, to three additional people not parties to this case, at least partially in satisfaction of his personal debts.[2]

3.

On June 26, 2023, Plaintiff filed a motion for an *ex parte* temporary restraining order, seeking to preclude any further transfers by the Defendants of funds which might be attributable to the Plaintiff, extremely expedited discovery, and a further interlocutory injunction hearing.

4.

In preparation for the interlocutory injunction hearing, Plaintiff issued a number of subpoenas for bank records, which provided significant evidence of the scope of wrongdoing with respect to the funds entrusted to Mr. Joyner by Plaintiff and the transfer of Plaintiff's funds to Mr. and Mrs. Joyner. Additionally, those records revealed very large transfers of Plaintiff's funds to three non-parties: Thomas and Joann

---

[1] Plaintiff wired the full amount of the funds - $2,014,226.16 - to Mr. Joyner's trust account on March 7, 2022.
[2] These transfers began as early as the date the funds were first wired to the trust account, March 7, 2022, and continued until at least April 7, 2023.

2

Hohmann ("Mr. and Mrs. Hohmann") and Stanley J. Williams ("Mr. Williams"). Specifically, $1,235,000 was transferred to Mr. and Mrs. Hohmann on April 19, 2022 in a single lump sum directly from the Law Firm's trust account, although the Hohmanns later refunded an apparent overpayment in the amount of $22,507.00. The bank records also indicate that $1,053,200 was paid to Mr. Williams between March 7, 2022, and November 4, 2022, via numerous wire transfers from the Law Firm's trust account and checks from the Law Firm's operating account.

5.

On November 13, 2023, Plaintiff filed her First Amended Complaint, which principally contained the same allegations and claims as the Initial Complaint apart from Count VII for unjust enrichment against Mrs. Joyner, which she amended to instead state a claim for money had and received against Mrs. Joyner.

## ADDITION AND SUBSTITUTION OF DEFENDANTS

6.

The above circumstances give rise to claims against Mr. and Mrs. Hohmann and Mr. Williams.

7.

In the time that has passed since the filing of the initial complaint, an estate has been opened on behalf of Mr. Joyner, with the county administrator of Gwinnett County, Hillary B. Cranford ("Ms. Cranford"), seeking appointment as the administrator of Mr. Joyner's intestate estate. Such appointment was apparently made on October 5, 2023.

3

8.

In light of the foregoing, Plaintiff moves for leave of Court to file a second amended complaint to add Mr. and Mrs. Hohmann and Mr. Williams as party-defendants, and to substitute Ms. Cranford in her capacity as administrator of the Estate of Mr. Joyner for Mr. Joyner personally as a defendant in this matter.

9.

O.C.G.A. § 9-11-21 provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

10.

O.C.G.A. § 9-11-25(a)(1) provides that "[i]f a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party[.]"

11.

Furthermore, the claims against the new defendants arise out of the same transaction or occurrence as those alleged in the original complaint, the statute of limitations has not run against any of the additional defendants, and accordingly, none of them have been prejudiced by the delay. See, e.g., Matson v. Noble Inv. Group, LLC, 288 Ga. App. 650, 654-55 (2007).

12.

Thus, the Court should exercise its discretion to allow the addition of Mr. and Mrs. Hohmann and Mr. Williams as party-defendants and to allow the substitution Ms. Cranford as administrator of Mr. Joyner's estate for Mr. Joyner himself. See Benschoter v. Shapiro, 197 Ga. App. 357, 357 (1990) ("The determination of whether a party should

4

be added is left to the discretion of the trial court, and that determination will be disturbed on appeal only if that discretion has been abused.")

## ADDITION AND SUBSTITUTION OF PLAINTIFFS

13.

Plaintiff filed the initial complaint individually and on behalf of her minor child, Sibyl Ellen Hunter ("Sibyl").

14.

Since the filing of the initial complaint, Sibyl has reached the age of majority.

15.

Accordingly, Plaintiff moves for leave of court, requesting to remain as a plaintiff in her individual capacity but to substitute Sibyl as an additional Plaintiff on Sibyl's own behalf.

16.

Plaintiff additionally moves for leave of court to add her other daughter, Elizabeth Ayers Hunter ("Elizabeth"), as a plaintiff in this matter.

17.

As the sole beneficiaries of the Lee Clay Hunter Irrevocable Trust, the funds of which were deposited into the Law Firm's IOLTA account and then misappropriated, Sibyl and Elizabeth each have a vested interest in the outcome of this case and are thus interested persons entitled to maintain suit.

18.

Again, pursuant to O.C.G.A. § 9-11-21, "[p]arties may be dropped or added by order of the court on motion of any party at any stage of the action and on such terms as are just."

5

19.

Pursuant to O.C.G.A. § 9-11-20(a), "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action."

20.

Here, Plaintiff, Sibyl, and Elizabeth each assert their rights arising out of the same series of transactions or occurrences, and any question of law or fact common to all of them will arise in the action, as they each have a vested, identifiable interest in the improperly transferred funds. In other words, the transactions are not merely "similar," but are the exact same series of transactions as those for which Plaintiff filed the initial complaint. Accordingly, the granting of this Motion is appropriate.

21.

Thus, Plaintiff moves for leave of Court to add Sibyl and Elizabeth as party-plaintiffs in this matter.

WHEREFORE, Plaintiff respectfully requests this Court enter an order granting this Motion, allowing the addition of Mr. and Mrs. Hohmann as party-defendants, the substitution of Ms. Cranford as administrator of Mr. Joyner's Estate as a party-defendant in place of Mr. Joyner personally, the substitution of Sibyl as an individual plaintiff, and the addition of Elizabeth as an individual defendant. Moreover, Plaintiff respectfully requests an order allowing the submission of an amended complaint substantially in the form of the proposed Second Amended Complaint attached hereto

as Exhibit 1, and granting such other and further relief as the Court deems just and

proper.

This 13th day of November, 2023.

SUGARMAN LAW LLP
154 Krog Street, NE – Suite 190
Atlanta, GA  30307
(404) 495-4811

/s/ F. Skip Sugarman
F. Skip Sugarman
Georgia Bar No. 690773
skip@sugarman-law.com
Matthew G. Hawk
Georgia Bar No. 788384
matt@sugarman-law.com

7

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

IN RE: C. DAVID JOYNER, P.C.,

              Defendant.

SHAY RICHARDSON,

              Plaintiff,

v.

C. DAVID JOYNER, P.C., CHARLES DAVID
JOYNER, and CASSANDRA JOYNER,

              Defendants.

CIVIL ACTION FILE
NO. 23-A-5262-9

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served all other parties in the foregoing

matter with a true and correct copy of the Plaintiff's **MOTION FOR LEAVE TO**

**AMEND TO ADD PARTIES AND FOR SUBSTITUTION OF PARTIES** and this

Certificate via e-filing as follows:

Dana K. Maine
Matthew Jager
Freeman, Gary & Mathis
100 Galleria Parkway, Suite 1600
Atlanta, GA 30339-5948

Gregory D. Jay
Chandler, Britt & Jay, LLC
P.O. Box 1749
Buford, Georgia 30515

D. Warren Auld
Law Office of D. Warren Auld
P.O. Box 1438
3274 Stone Mountain Highway
Snellville, GA 30078

Lawrence L. Washburn, III
Law Office of Lawrence L. Washburn III P.C.
One Culver Center
245 W Crogan Street
Lawrenceville, GA 30046

Charles L. Bachman, Jr.
Gregory Doyle Calhoun & Rogers LLC
49 Atlanta Street
Marietta, GA 30060

Chandelle Summer
Summer & Summer
P.O. Box 921
Gainesville, GA 30503

8

This 13th day of November, 2023.

SUGARMAN LAW LLP
154 Krog St. NE
Suite 190
Atlanta, GA  30307
(404) 495-4811
Attorneys for Plaintiff

/s/ F. Skip Sugarman
F. Skip Sugarman
Georgia Bar No. 690773
skip@sugarman-law.com
Matthew G. Hawk
Georgia Bar No. 788384
matt@sugarman-law.com

9